**COASTAL STATES TRADING, INC.**

v.

**SHELL PIPELINE CORPORATION.**

Civ. A. No. H–82–998.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 26, 1983.

**1416**

Clann & Pearson, Edward J. Murphy, Houston, Tex., for plaintiff.

J.A. Berlanga, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

STERLING, District Judge.

### I.

#### Nature of the Case

This is an action to recover damages for an alleged misdelivery of crude oil. Plaintiff, Coastal States Trading, Inc., asserts that it delivered crude oil for shipment on a pipeline operated by Defendant, Shell Pipe Line Corporation ("Shell"), and provided certain instructions for delivery in accordance with Shell's shipment procedures.

Plaintiff alleges that the oil was not delivered according to its instructions and that this alleged misdelivery proximately resulted from Shell's breach of tariff duties under the Interstate Commerce Act, 49 U.S.C. § 20(11), *revised* 49 U.S.C. § 11707(a)(1) (Supp. III 1979), and contract duties under the Pomerene Bills of Lading Act, 49 U.S.C. § 81 *et seq.* (1976). Alternatively, Plaintiff seeks recovery based upon Shell's conversion or negligence as a bailee under the Court's pendent jurisdiction. Plaintiff seeks to recover the fair market value of the oil which it claims is valued at $3,464,-250.00.

Shell disputes the entire characterization of the transaction and contends that the federal statutes relied on by Plaintiff do not confer subject matter jurisdiction on the Court. Moreover, Shell contends that even if the Pomerene Bills of Lading Act could be construed to govern oil pipelines, Shell's activities in the present action do not constitute "transportation" within the scope of the Act. At best, Shell maintained a records service which recorded transfers of rights to receive oil shipments among crude oil resellers. Such voluntary activities, even if gratuitously shared with third parties such as Plaintiff, do not constitute "transportation." In summary, Shell contends that the federal statutes do not confer subject matter jurisdiction on the Court.[1]

### II.

#### Trading the Oil and Keeping the Books

A. *Historical Background*

This action concerns rights and liabilities of parties who engage in transactions known as "in-line transfers" of crude oil. An understanding of these transactions is crucial to the resolution of the case. For this reason the Court will trace the historical development of the practice in the crude oil market, and will also examine the commercial mechanics of the transactions.

---

**1.** The Court recognizes that, without federal subject matter jurisdiction, the entire action, including Plaintiff's common law claims, is subject to dismissal.

### 1. Emergence of the "In-Line Transfer" Practice.

The claims in this case arose from so-called "in-line transfers" of rights to receive crude oil from Shell's pipeline. Prior to 1972, "in-line transfers" on the pipelines operated by Shell were comparatively rare, numbering less than 20 changes of consignees per month. These transactions were mainly between major refiners and were primarily used to balance supply by geographic location. Prior to 1973, crude oil resellers such as Plaintiff were relatively few in number.

In late 1973 the emergence of resellers [2] and the unprecedented growth of "in-line transfers" heavily impacted Shell's pipeline. Until 1978, reseller transactions on Shell's pipelines were listed on run tickets, but by 1979, reseller activity had become sufficiently voluminous that Shell utilized a computer to monitor the transactions. In 1980, reseller transactions created an enormous logjam. For example, in December, 1980, approximately 500 different companies were involved in resales on Shell's pipelines. At this time, reseller transactions were running at a rate of over 4,000 per month with some transaction chains as long as 900 transactions. In view of these complexities, Shell modified its procedures to require that resellers submit transactions through data-grams with confirming letters.

### 2. Mechanics of "In-Line Transfers".

During the first seven months of 1981, Shell provided a listing of transactions to shippers and crude oil resellers. The listing of transactions involved a three-step process. First, prior to the first day of the month in which the crude oil was to be shipped (generally by the 28th day of the month preceding shipment), any person wishing to conduct transactions concerning the oil sent Shell a data-gram specifying its name, telephone number, month of transaction, the carrier, the volume and the identities of the persons involved in the transaction. Secondly, this data-gram was confirmed by letter. Finally, at the end of the transaction month, Shell sent the parties a "transaction letter" detailing the reseller transfers. This "transaction letter" recorded transfers of rights to receive oil shipments. The actual transactions were completed and submitted to Shell by data-gram and confirming letter prior to the time the oil was tendered for shipment. Shell was not a party to these agreements.

In a typical "in-line transfer," the shipper contracted to sell or ship oil to the account of the original consignee. This consignee would be identified in the nomination form submitted by the shipper. Prior to tender by the shipper, the original consignee transferred its right to receive the oil to another party, possibly a crude oil reseller. This person would then sell his rights to one or more additional transferees, who, in turn, resold their rights to receive all or

**2.** In late 1973, the Arab oil embargo dramatically increased the price of crude oil, and the situation began to change. Price controls and entitlement regulations were promulgated, and a two-tier pricing structure was created. Under this structure, certain oil was priced at world market levels, while other oil, such as domestic oil produced from established wells, was controlled at much lower prices. These regulations encouraged the growth of small refiners and crude oil resellers. Needless to say, enormous profits could be realized by companies who bought domestic oil priced at the low controlled tier and resold it as "new" oil at the higher world market tier. Tremendous profits could also be realized in times of shortage by buying and selling the same oil many times and adding a few cents to the price of the oil at each transaction. These potential financial rewards afforded substantial incentive for crude oil resellers to "churn" the oil or create "daisy chains" of paper transactions. *See generally* THE CASE OF THE BILLION DOLLAR STRIPPER—THE EVASION OF PRICE CONTROLS ON DOMESTIC CRUDE OIL BY RESELLERS, HOUSE COMM. ON INTERSTATE AND FOREIGN COMMERCE, H.R.Doc. No. 58, 96th Cong., 2d Session (1980); *White Collar Crime in the Oil Industry; Joint Hearings Before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce and the Subcomm. on Crime of the House Comm. on the Judiciary,* 96th Cong., 1st Sess. 1–45 (1979).

By this citation, the Court does not imply that Plaintiff engaged in price manipulation or evasion. These materials are cited solely as explanations of the crude oil trading market.

part of the same oil to other transferees. In this manner, long transaction chains were created involving the same shipment of crude oil. All of these transactions were arranged prior to the actual shipment of the oil. Each purchaser in the chain would submit to Shell a data-gram and confirming letter specifying from whom the purchaser had purchased the oil and to whom it was resold. Each party to the transaction received the transaction letter recording the amount of oil and the identities of the persons involved.

Under these facts, the term "in-line transfers" is clearly a misnomer. Actually, these transactions do not take place while the oil is in transit. The ultimate recipient of the oil is generally determined before tender. Upon tender, the oil is transported directly to the ultimate recipient without interruption and without physical delivery to any intermediate reseller. Hence, "in-line transfer" means only that the original consignee transfers its rights to receive the oil to another party.

The agreement is a transaction involving intangible contract rights, rather than tangible goods. Since the oil does not actually come into the physical possession of any crude oil reseller, the resellers obviously cannot "tender" the oil for transportation by Shell. Just as certainly, Shell never "delivers" the oil to resellers, unless, by coincidence, the reseller happens to be the last person in the chain. In short, Shell keeps the books. Viewed from this perspective, the use of "transportation" terminology ignores commercial reality and is inherently misleading.[3]

### B. *The Present Case*

Shell is part owner and operator of the Ship Shoal Pipeline System (hereinafter "SSPS or System") under an agreement executed on August 2, 1967.[4] Pursuant to that Agreement and subsequent amendments, Paloma Pipe Line Company and Pure Transportation Company own an undivided interest in the System along with Shell.

The controversy in this case arises out of an in-line transfer involving Plaintiff, Basin, Inc. ("Basin"), and Basin Refining, Inc. ("Basin Refining"). During all time periods relevant to this action Plaintiff was in the crude oil reselling business. On or about April 28, 1981, Plaintiff's employees allegedly contacted Basin for the purpose of entering into an agreement for the sale of crude oil. On this particular occasion Plaintiff was selling the crude oil on "spot" basis and not pursuant to a long-term contract. Basin representatives, however, maintain that they did not enter into any agreement with Plaintiff. They maintain that the agreement was between Plaintiff and Basin Refining.

Pursuant to the procedures established among resellers to handle in-line transfers, Plaintiff advised Shell that it was transferring its right to receive oil to Basin. Basin, however, did not acknowledge that it was accepting this transfer because according to Basin it did not have an agreement with Plaintiff. Instead Basin Refining advised Shell that it was a party to Plaintiff's transaction and further advised that it was transferring its right to receive oil to Coral Petroleum, Inc.

The alleged lack of an agreement between Plaintiff and anyone was not discovered until Shell mailed its transaction letter to the parties on or about June 10, 1981.[5] By that time, Basin Refining was in bankruptcy. Plaintiff thereafter entered into discussions with Basin which resulted in a compromise on or about July 1, 1981, as a condition of continuing the business relationship. The compromise provided that Basin did not admit liability regarding the sale of the oil in question. Basin filed its own petition in bankruptcy about one year later.

---

3. Although the term "in-line transfer" is a misnomer, in this opinion, the term will be used to refer to the transactions which form the basis of this action.

4. Shell has been sued in this action as the operator of the SSPS.

5. Plaintiff's assignee is not a party to this litigation.

This action arose because Plaintiff maintains, and Shell denies, that Shell had the responsibility to alert the parties about the mix-up in the identities of the parties to the transaction. Shell did not have the ability to pinpoint the mix-up because Shell's computer was not programmed or keyed to differentiate between Basin and Basin Refining. The computer was not coded to differentiate between the two Basin companies because Basin Refining had not done business on the Ship Shoal System.

## III.

A. *The Court Lacks Subject Matter Jurisdiction in View of the Inapplicability of the Interstate Commerce Act and Pomerene Bills of Lading Act.*

In its complaint, as well as in the pre-trial order, Plaintiff has asserted subject matter jurisdiction under the Interstate Commerce Act, 49 U.S.C. § 20(11), *revised* 49 U.S.C. § 11707(a)(1) (Supp. III 1979), and the Pomerene Bills of Lading Act, 49 U.S.C. § 81 *et seq.* It also asserts jurisdiction under an "Act of Congress regulating Commerce," 28 U.S.C. § 1337 (1976), and "federal question" jurisdiction under 28 U.S.C. § 1331 (1976). As will be developed below, however, the Interstate Commerce Act and the Pomerene Bills of Lading Act are wholly inapplicable to oil pipelines, and thus, do not justify federal jurisdiction. Moreover, Plaintiff has not pleaded violation of any federal statutes and has not incorporated statutory violations as contentions in the pretrial order. Thus, under the well-pleaded allegations in the complaint the Court does not have jurisdiction under 28 U.S.C. § 1331 or 1337. *Fragumar Corporation, N.V. v. Dunlap,* 685 F.2d 127, 128 (5th Cir.1982).

1. *The Interstate Commerce Act*

The duties and liabilities of common carriers under the Interstate Commerce Act, as amended in 1978, are found in 49 U.S.C. § 11707 (Supp. III 1979). Section 11707(a)(1) provides, in pertinent part:

"A common carrier providing transportation or service *subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of this title* shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. That carrier and any other common carrier that delivers the property and is providing transportation or service *subject to the jurisdiction of the Commission under subchapter I, II, or IV* are liable to the person entitled to recover under the receipt or bill of lading." (Emphasis added).

Claims under § 11707(a)(1) may be filed in either federal or state court. See 49 U.S.C. § 11707(d) (Supp. III 1979). Carriers "subject to the jurisdiction of the Interstate Commerce Commission" are set forth in 49 U.S.C. § 10501 (Supp. III 1979), which expressly excepts oil pipelines from jurisdiction. Section 10501(a) provides, in pertinent part:

"Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation (1) by rail carrier, express carrier, sleeping car carrier, water common carrier, and pipeline carrier that is—

\*      \*      \*      \*      \*      \*

(C) by pipeline or by pipeline and railroad or water when transporting a commodity other than water, gas or oil...."

This exception was recognized in the 1978 amendment and recodification of the Interstate Commerce Act. Prior to 1978, oil pipelines were subject to I.C.C. jurisdiction. At that time, the Act broadly applied to "[t]he transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water...." 49 U.S.C. § 1(1)(b) (1976). As a result of the 1978 amendment, however, jurisdiction over oil pipelines was transferred to the Federal Energy Regulatory Commission. See 42 U.S.C. § 7155 (Supp. III 1979).

1420

The Court concludes that under its plain language, the Interstate Commerce Act is inapplicable to this transaction. Congress' intent could not have been stated more clearly. Accordingly, this Court lacks subject matter jurisdiction under the Interstate Commerce Act.

2. *The Pomerene Bills of Lading Act*

■ Plaintiff also asserts jurisdiction under the Pomerene Bills of Lading Act, 49 U.S.C. § 81 *et seq.* (1976). Although this Act governs the rights and liabilities of parties dealing with bills of lading, it does not contain any provision which can be interpreted as a grant of federal jurisdiction. Neither can it be used as a "bootstrap" to assert federal jurisdiction under 28 U.S.C. § 1331 or 1337, because as a matter of law, the Act is inapplicable to this action.

Generally, the Act governs the duties and liabilities of common carriers under bills of lading. The scope of the Act is set forth in 49 U.S.C. § 81 (1976), as follows:

> "Bills of lading issued by any common carrier for the transportation of goods in any Territory of the United States, or the District of Columbia, or from a place in a State to a place in a foreign country, or from a place in one State to a place in another State, or from a place in one State to a place in the same State through another State or foreign country, shall be governed by this chapter."

While the Act imposes various duties on common carriers regarding bills of lading, *.e.g.* 49 U.S.C. § 89 (1976), it applies only to those carriers which actually issue bills of lading. An oil pipeline, however, is not required to issue bills of lading, and hence, is not subject to liability under the Act.

49 U.S.C. § 11707 (Supp. III 1979) specifies those carriers which must issue bills of lading. Under § 11707(a)(1), only carriers which are subject to the jurisdiction of the Interstate Commerce Commission are required to issue bills of lading. As was developed earlier, oil pipelines are specifically excluded from I.C.C. jurisdiction under § 10501(a)(1)(C). Thus, since Shell was not a common carrier required to issue a bill of lading, the Act is inapplicable.

Even if the Act is construed to apply to oil pipelines, however, the activity involved in this transaction did not constitute "transportation" within the meaning of the Act. Section 81 specifically restricts the Act's application to bills of lading used for the transportation of goods; hence, unless the transaction involved in this action constitutes "transportation," the Act does not apply.

■ The word "transportation" in the Interstate Commerce Act, as amended, 49 U.S.C. § 10102(25) (Supp. III 1979),[6] is meant to include the entire body of services incident to the carriage itself. *Southern Railway Company v. Reid*, 222 U.S. 424, 440, 32 S.Ct. 140, 143, 56 L.Ed. 257 (1912). *See also Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Dettlebach*, 239 U.S. 588, 36 S.Ct. 177, 60 L.Ed. 453 (1916), in which, on the issue before this Court, the Court concluded that the term "transportation" included all services in connection

6. "Transportation" is defined in 49 U.S.C. § 10102(25) (Supp. III 1979) as follows:

"(25) 'transportation' includes—
(A) a *locomotive, car,* vehicle, motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, re*gardless of ownership or an agreement con*cerning use; and
(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, stor*age, handling, and interchange of passengers and property.*"

The definition provided in the 1978 amendments essentially remained the same from the previous version, 49 U.S.C. § 1(3)(a) (1976), which provided:

"The term 'transportation' as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported."

with the shipment including storage at destination.

These decisions, however, do not bear directly on the question as to when, and under what circumstances, the delineation of services as transportation begins and ends. Accordingly, on the facts of this case, the threshold jurisdictional inquiry for the court is to determine whether the transaction listings provided by Shell constitute transportation under the Interstate Commerce Act as applied to the Pomerene Bills of Lading Act. Under the provisions of the Act it is the opinion of the Court that the transaction listing of "in-line transfers" provided by Shell must be a service within the transportation definition of the Act which is provided in 49 U.S.C. § 10102(25)(B) (Supp.III 1979).[7]

In *Cleveland C., C. & St. L. Ry., supra,* the Supreme Court concluded that under the terms of the Hepburn Act of 1906, 34 Stat. 584, which amended the Interstate Commerce Act, Congress recognized the duty of carriers to perform a variety of services enumerated but which are "separable from the carrier's service as carrier," *id.* at 594, 36 S.Ct. at 180, and, "in order to prevent overcharges and discriminations from being made under the pretext of performing such additional services, it enacted that, so far as interstate carriers by rail were concerned, the entire body of such services should be included together under the single term 'transportation,' and subjected to the provisions of the act respecting reasonable rates...." *Id. See also, Southern Railway Company v. Prescott,* 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836 (1916). Indeed, other cases emphasize that services not listed in section 1(3) are not "transportation" under the Act. As the court explained in *Pennsylvania Railroad Company v. United States,* 227 F. 911 (W.D.Pa.1915), *aff'd,* 242 U.S. 208, 37 S.Ct. 95, 61 L.Ed. 251 (1916), the 1906 amendment to the Interstate Commerce Act brought within the definition of transportation "certain defined services" that "relate to the receipt, delivery, transfer, ventilation, refrigeration, storage, and handling of

property transported." *Id.* at 916. Moreover, as the Court of Appeals for the Fourth Circuit has observed, these services take their meaning from the listed acts. *Walling v. Baltimore Steam Packet Co.,* 144 F.2d 130, 133 (4th Cir.1944). Listing of "in-line transfers" does not fit under any of the acts listed.

■ It is well established that services provided by common carriers simply for the convenience of shippers do not constitute "transportation." In the leading case of *Great Northern Railway Company v. Minnesota,* 238 U.S. 340, 35 S.Ct. 753, 59 L.Ed. 1337 (1915), the Supreme Court overturned an order directing the Great Northern Railway to install six-ton scales for the convenience of shippers. In an oft-quoted statement, the Court declared:

"The business of a railroad is transportation, and to supply the public with conveniences not connected therewith is no part of its ordinary duty."

*Id.* at 345, 35 S.Ct. at 754.

Moreover, the Court noted that "[t]he demands upon a carrier which lawfully may be made are limited by its duty...." *Id.* at 346, 35 S.Ct. at 754.

■ The logic of *Great Northern Railway* was followed by the Commission in *In the Matter of Bills of Lading,* 52 I.C.C. 671 (1919) on the question of when the carrier's liability as such would cease and its duties as warehouseman would begin. In broader terms, the Commission in this case delineated the distinction between services as transportation. *In the Matter of Bills of Lading* was a proceeding to establish uniformity among bills of lading wherein shippers and carriers proposed standard terms to be included in a bill of lading. One such shipper proposed to enlarge the consignor's right to direct the carrier to deliver only upon tender of the freight charge by stipulation on the bill of lading. The shippers proposed change in the language of the bill to permit such stipulation by notation on the face of the bill or in a written order of reconsignment. *Id.* at 721. The carriers

7. See note 6, *supra.*

objected to the proposal because it saddled them with the risk of losing their right to payment because of wrongful delivery. The Commission rejected the shippers' proposal, explaining:

> "We do not regard the shippers' position favorably. Its effect would be to impose upon the carrier additional risk and responsibility, not in respect to any common-law or statutory duty of *transportation*, but in respect of the security of compensation for its services. The end desired by the shippers has to do with the convenience and security of their oftentimes speculative and impromptu commercial transactions. The business of the carrier is to furnish transportation. Its legal obligations are confined to transportation and the duties incident thereto. It is not obligated to assume risks for the convenience of the consignor which have no direct relationship to its service of transportation."

*Id.* at 722 (emphasis in original).

In structuring its reasoning the Commission concluded that liability does not attach until the property has been delivered to the carrier for immediate transportation, *Id.* at 704, and noted that "[w]hen goods are merely delivered to a carrier or deposited in its warehouse and are not to be transported until further orders from the owner, the carrier's liability is that of warehouseman or bailee only." *Id.* The commission distinguished this situation from the transactions involving goods in transportation. The Commission observed that "[u]nder modern practice the owner of goods [in transit] may usually direct the carrier to stop his goods in transit [and] ... may then reconsign them to another consignee ... take delivery of them ... [or] order them diverted to a different destination...." *Id.* The storing of goods under these circumstances is an incident to transportation and as such is part of interstate scheme of transportation.[8] *Id.*

The Commission has also repeatedly held that services provided for the convenience

of shippers to facilitate the sale of property transported are not required carrier functions. *See Reconsignment and Storage of Lumber and Shingles*, 27 I.C.C. 451, 456 (1913) (storage of commodities for the convenience of shippers while the shippers locate a market for the commodities; *The Car Peddling Case*, 45 I.C.C. 494, 502 (1917) (right of public in use of railroad property limited to transportation service and merchants are not entitled to use railroad cars as vending places for merchandise arriving in them). *Cf., National Trailer Convoy, Inc. v. United States*, 227 F.Supp. 730, 734 (N.D.Okla.1964) ("Activities pertaining to sale [of the property transported] are beyond the scope of transportation").

Application of the Pomerene Bills of Lading Act can only be sustained upon a finding that the documentation service is related to transportation. The case law makes clear that a service is "related to" transportation, when it is "necessarily incidental" to transportation. The leading case on this subject is *Guaranty Claim of the Central Elevator & Warehouse Co.*, 73 I.C.C. 169 (1922). There, the Commission refused to certify a guaranty claim of a warehouse because the warehouse service was not necessarily incidental to transportation. The Commission stated:

> "Storage of property transported is a transportation service only to the extent that storage is necessarily incidental to transporting such property, and the term has been used in section 1 in that limited sense."

73 I.C.C. at 176.

The Commission further explained that while certain services such as elevation properly pertain to transportation because they are preliminary to the immediate transportation, other services, including storage of grain for hire for indefinite periods, are not actually incidental to transportation.

---

**8.** Additionally, the Commission noted that where these practices are "regularly done in accordance with commercial customs and practices, [compensation or consideration] is cus-

tomarily provided for by carriers in their tariffs." *In the Matter of Bills of Lading,* 52 I.C.C. 671, 704 (1919).

In *Burkley Produce Company v. Pennsylvania Railroad Company*, 277 I.C.C. 319 (1950), the Commission held that it was without jurisdiction to assess the reasonableness of storage charges collected on produce unloaded onto the defendant's platform from which the complainant and others would sell their produce. The Commission dismissed the complaint on the grounds that such storage was neither incidental nor necessary to the transportation service provided, explaining that at the time the goods were unloaded its service in transportation had ceased and its service from that time forward for the convenience of the complainant was not a function which could be required of a carrier. *Id.* at 322.

■ Shell services as a clearinghouse do not have a direct relation to the transportation of crude oil and are provided for the convenience of crude oil resellers. Therefore, the services Shell provides do not justify invocation of jurisdiction under the Pomerene Bills of Lading Act. Moreover, the Court concludes that only those services incidental to the physical movement of property are related to transportation under the Act. Shell's duties as shipper for pipeline transportation do not begin until such time as the crude oil is delivered to the pipeline and the final destination is decided and communicated to Shell. The recording of "in-line transfers," which occur *prior to the time of shipment*, is a bookkeeping or clearinghouse function provided gratuitously by Shell for crude oil resellers; in fact, the shipper of the oil is not a party to the chain of transactions. Thus, the Pomerene Bills of Lading Act does not apply to the clearinghouse service involved in this action and does not provide jurisdiction under 28 U.S.C. § 1331 or under § 1337.

B. *Pendent Jurisdiction over Plaintiff's Common Law Claims.*

■ Plaintiff has also urged the common law claims of conversion and negligence as a bailee. Since the Court has dismissed Plaintiff's federal claims for lack of subject matter jurisdiction, the Court declines to exercise pendent jurisdiction over Plaintiff's common law claims, which involve questions of state law, under the authority of *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) and its progeny.

It is, therefore,

ORDERED that Plaintiff's claims under the Pomerene Bills of Lading Act, 49 U.S.C. § 81, *et seq.* (1976) and the Interstate Commerce Act, 49 U.S.C. § 20(11), *revised* 49 U.S.C. § 11707(a)(1) (Supp. III 1979) are dismissed with prejudice. It is further ORDERED that Plaintiff's common law claims of conversion and negligence as a bailee brought under the Court's pendent jurisdiction are dismissed without prejudice.