**SHELL PIPELINE CORPORATION, Appellant,**

v.

**COASTAL STATES TRADING, INC., Appellee.**

No. 01–89–00452–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 15, 1990.

Rehearing Denied May 10, 1990.

Richard O. Faulk, Houston, for appellant.

John F. Waldo, Edward J. Murphy, Houston, for appellee.

Before JACKSON B. SMITH, Jr., and STEPHENS, Retired JJ., Sitting by Assignment, and HUGHES, J.

## OPINION

JACKSON B. SMITH, Jr., Justice (Retired).

Shell Pipeline Corporation (Shell) brings this appeal from a judgment awarding Coastal States Trading, Inc. (Coastal) damages in the amount of $1,762,350. In a nonjury trial, the court found that Shell was 50% negligent, and that Coastal and its trading partners, Basin, Inc. (Basin) and Basin Refining, Inc. (Basin Refining), were also 50% negligent in causing the delivery of 93,000 barrels of crude oil to the wrong consignee, and awarded Coastal one-half of its $3,524,700 damages.

Initially, Coastal sought relief in the federal district court. After the case was fully developed in the federal court and dismissed for want of jurisdiction,[1] the parties by agreement submitted this case to the state court on the record developed in the federal court. From that record we have developed the following facts.

In 1981, Coastal was in the oil trading business. Shell was a partner in and designated operator of the Ship Shoal Pipeline, which served as a conduit for offshore oil produced in the Gulf of Mexico to onshore

---

1. *Coastal States Trading, Inc. v. Shell Pipeline Corp.*, 573 F.Supp. 1415 (S.D.Tex.1983), which is sometimes referred to as "the prior federal action."

terminals and other pipelines located in the state of Louisiana.

During April 1981, Coastal agreed to purchase crude oil from two companies, P & O Falco and Mutual Petroleum of Texas. Each company was to deliver 1,500 barrels of oil a day during the month of May 1981 to the Shell terminal for Coastal. The amount totaled 93,000 barrels.

Coastal decided to resell the oil. One of its "oil traders," Douglas Peterson, contacted a "trader," Rodney Madden, whom he presumed was associated with Basin. A deal was made for the sale of 93,000 barrels of crude oil. Unknown to Peterson, Madden was trading for Basin Refining, a sister company to Basin. Coastal notified Shell by datagram that it would deliver 3,000 barrels of oil daily during the month of May to the Ship Shoal Pipeline to be delivered to Basin at Shell's onshore terminal. Shell placed this information in its computer.

Basin Refining notified Shell by datagram that it had traded the oil to Coral Petroleum Company. Basin also notified Shell by datagram of its oil trades, but none of those trades involved Coastal or Coral. Because the stationery of Basin and Basin Refining were very similar, the Shell computer employee did not notice the discrepancy in the names in the Basin Refining confirmation letter and entered the transaction in the computer as a trade from Basin to Coral. Coral notified Shell by datagram that it had traded the oil to Latina Oil Company. All of these transactions occurred on or about April 28, 1981, prior to Shell receiving any oil in the month of May.

In mid-May 1981, Coastal became aware that it had traded the oil to Basin Refining, but by the time it attempted to collect its money, Basin Refining had filed for bankruptcy. Thereafter, Basin filed for bankruptcy and, as improbable as it may seem, we understand from the arguments made to this Court, that Coral and Latina Oil also filed for bankruptcy.

Shell's Ship Shoal Pipeline is a "common stream pipeline." This means that there is a continuous flow of oil in the pipeline because oil production from various offshore wells flows directly into the Ship Shoal Pipeline. Thus, none of the owners actually had title to any specific barrel of oil, but simply had the right to a specific percentage of each month's production placed in the pipeline. An owner could take delivery of the oil or sell the oil for direct delivery to a buyer. It apparently was not unusual for several trades to be made before the oil was actually delivered to Shell's pipeline.

Sometime prior to the present transaction, due to a significant increase in trades, Shell commenced a specific computerized procedure for submitting the written requests of its customers. This procedure permitted the owner of the oil to call Western Union's datagram service and specify how much oil would be delivered to Shell's pipeline and to whom it was to be delivered. Western Union could then feed this information directly into Shell's computer. (The owners also confirmed in writing, directly to Shell, the information conveyed by datagram.) If the consignee (or subsequent consignees) intended to trade the oil, the same procedure was followed. All such transactions had to be submitted by the twenty-eighth of the month prior to the month during which the oil would be delivered to the pipeline. Shell's computer kept track of all transactions and was programmed to identify any mismatches or breaks in the chain.

In the month after Shell moved oil, Shell would issue what it called "transaction letters," informing the parties involved in the prior month's transactions what Shell had done with the oil.

When Shell's computer alerted its personnel to a mismatch in the nominations of a trade, Shell would inform the parties involved in the trade that the nominations did not match. If the parties failed to resolve the problems of the mismatch, Shell's "hard and fast policy" was that the oil would not move. Apparently, many of the oil traders who used Shell's pipeline relied upon Shell's "transaction letters" to keep records of their trades.

■ In its first point of error, Shell asserts that the Federal Energy Regulatory Commission (FERC) has exclusive or primary jurisdiction over issues affecting oil pipelines. It argues the trial court erred in refusing to dismiss this case for lack of jurisdiction.

Initially, Shell contends that FERC has exclusive jurisdiction over this transaction because Congress vested jurisdiction over all pipelines in FERC, but did not enact enabling legislation to permit suits outside of FERC's jurisdiction. It points out that, prior to 1978, common carriers were governed by the Interstate Commerce Act which permitted claims to be filed in either federal or state courts. Thus, because of the absence of the enabling legislation in the 1978 law, Shell reasons that it was Congress's intent to vest FERC with exclusive jurisdiction in controversies involving loss or damage to oil transported by pipelines.

Shell also points out that FERC has implemented its jurisdiction by promulgating rules and regulations to govern such controversies within its jurisdiction. 18 C.F.R. sec. 385.206 (1989).

We first note that Shell has not cited this Court to any cases that support its contention of exclusive jurisdiction in FERC. However, there is sufficient federal case law to give us adequate guidelines to make a determination of Shell's contention.

■ As a general principle, state courts may assume subject matter jurisdiction absent provision by Congress to the contrary or disabling incompatibility between the federal claim and state court adjudication. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78, 101 S.Ct. 2870, 2874–75, 69 L.Ed.2d 784 (1981).

The United States Supreme Court has instructed us that "in considering the propriety of state-court jurisdiction over any particular federal claim, the court begins with the presumption that state courts enjoy concurrent jurisdiction." *Id.* at 478, 101 S.Ct. at 2875; *see also California v. Arizona*, 440 U.S. 59, 66–67, 99 S.Ct. 919, 923–24, 59 L.Ed.2d 144 (1979). It has been long established that this presumption may

be rebutted by statute, by unmistakable implication from legislative history, or by clear incompatibility between state court jurisdiction and federal interests. *Gulf Offshore Co.*, 453 U.S. at 478, 101 S.Ct. at 2875; *Claflin v. Houseman*, 93 U.S. 130, 136, 23 L.Ed. 833 (1876); *see also Garner v. Teamsters*, 346 U.S. 485, 488, 74 S.Ct. 161, 164–65, 98 L.Ed. 228 (1953).

In the instant case, commencing with the presumption that the state trial court had jurisdiction, we find nothing in Shell's contention that rebuts that presumption.

First, it is uncontested that the statute transferring regulatory jurisdiction of oil pipelines to FERC did not enact any enabling legislation which permitted suits outside of FERC's jurisdiction. The silence or inaction of Congress on enabling legislation that would have permitted suits outside of FERC's jurisdiction does not overcome the rebuttable presumption that state courts enjoy concurrent jurisdiction even in respect to those matters covered exclusively by federal law. *See Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 507–508, 82 S.Ct. 519, 522–523, 7 L.Ed.2d 483 (1962). If Congress had desired to give FERC exclusive jurisdiction, it could have explicitly done so.

Secondly, the presumption of state court jurisdiction could have been rebutted by unmistakable implication from legislative history. Shell's only contention in this regard is that prior legislation permitted claims to be filed in both federal and state courts. We have heretofore rejected Shell's contention that inaction by Congress gave FERC exclusive jurisdiction, and we find no merit to this contention.

Finally, the third basis for overcoming the rebuttable presumption, that state courts enjoy concurrent jurisdiction, is that there must be a clear incompatibility between state court jurisdiction and federal interests. Shell has not suggested that there is any incompatibility between state court jurisdiction and federal interests in the present case. We perceive no incompatibility, and see nothing inimical to FERC's jurisdiction by allowing the state

court to have jurisdiction under the facts of the present case.

We conclude that Shell has failed to rebut the presumption that the trial court in the present case had jurisdiction.

Shell next asserts, that even if FERC did not have exclusive jurisdiction over Coastal's claims, that FERC had primary jurisdiction in this matter.

■ "Primary jurisdiction" is a judicially created doctrine whereby a court may dismiss or stay an action, pending a resolution of some portion of the case by an administrative agency. Our federal courts have told us that "primary jurisdiction" is applicable "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). The application of such doctrine is especially appropriate where uniformity of certain types of administrative decisions is desirable, or where there is a need for the expert and specialized knowledge of the agencies. *Id.*

■ Applying the facts of the present case to the standards set forth in *Western Pacific*, we find Shell's arguments less than persuasive.

Shell's argument that FERC should have primary jurisdiction because of a need for "uniformity" and "specialized knowledge" is misplaced. The trial court's judgment makes it abundantly clear that its decision was based upon a contract and the negligence of the parties involved. Although there was a tariff involved in the transportation of the oil over the Shell pipeline, neither that tariff nor any FERC regulatory scheme, rule, or regulation was the basis for the trial court's judgment. The need for uniformity under the facts of the present case is not applicable because this is not a continuing situation. Shell discontinued its procedure for keeping track of oil trades in August 1981. Under such circumstances, it would appear inappropriate to make a referral to FERC. *See Missis-*

*sippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 419 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). Moreover, to say that a federal administrative agency such as FERC has more expertise in the construction or application of a specific state's laws than that state's own courts makes little sense and seems illogical. This is so because federal courts and administrative agencies generally look to state court decisions when applying state laws related to federal matters. *See, e.g., CAVIC v. Grand Bahama Dev. Co.*, 701 F.2d 879, 882 (11th Cir.1983).

■ The phrase "primary jurisdiction" indicates that both an administrative agency and a court have jurisdiction. Shell points out that the doctrine of primary jurisdiction is prudential rather than jurisdictional. Because the doctrine of primary jurisdiction is prudential, the appropriate standard of review is to ascertain whether the trial court abused its discretion in assuming jurisdiction. *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir.1988). The facts in the present case do not require special expertise from FERC and the question of uniformity of law among states is not applicable. Applying the standards set forth in *Western Pacific*, we find no abuse of discretion by the trial court in assuming jurisdiction of this case.

For the reasons stated above, we conclude that the Federal Energy Regulatory Commission has neither exclusive jurisdiction nor primary jurisdiction in the present case, and overrule Shell's point of error one.

■ In its second point of error, Shell alleges that the trial court erred in basing its judgment upon fact findings that were inconsistent with the facts found in the prior federal action because, as a matter of law, the federal court's findings were conclusive under the rules of collateral estoppel.

■ Federal res judicata rules apply when res judicata is asserted in a state proceeding after a related federal proceeding is concluded. *Jeanes v. Henderson,*

688 S.W.2d 100, 103 (Tex.1985). Similarly, federal collateral estoppel rules apply when collateral estoppel is asserted in a state court proceeding at the conclusion of a related federal proceeding. *Eagle Properties, Ltd. v. Scharbauer*, 758 S.W.2d 911, 915 (Tex.App.—El Paso 1988, writ granted).

■■■ For the federal doctrine of collateral estoppel to apply to a subsequent, related state court proceeding, three requirements must be met. First, the prior federal decision must have resulted in a "judgment on the merits;" secondly, the same fact issues sought to be concluded must have been "actually litigated" in the federal court; and, thirdly, the disposition of those issues must have been "necessary to the outcome" of the prior federal litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).

In this case, in the prior federal action, the federal district court judge held that the Interstate Commerce Act and the Pomerene Bills of Lading Act were wholly inapplicable to oil pipelines and provided no basis for federal jurisdiction. *Coastal States Trading Inc.*, 573 F.Supp. at 1419. The judge also found that Coastal had not pled violations of any federal statutes or incorporated any statutory violations as contentions in the pretrial order, and therefore concluded that the federal court lacked jurisdiction under 28 U.S.C.A. secs. 1331 or 1337 (1989). Coastal's federal causes of action were dismissed with prejudice; however, its common-law claims of conversion and negligence as a bailee were dismissed without prejudice. *Id.* at 1423.

■■■ In determining whether the federal doctrine of collateral estoppel is applicable in the present case, we adopt the three step analysis set forth in *Parklane Hosiery Co.*, 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5. In a determination of the special issue of whether a jurisdictional dismissal constitutes a "judgment on the merits," it is well established that a dismissal for lack of jurisdiction is not a judgment on the merits, and does not bar a subsequent suit on the same claim unless, as a precondition to

determine its jurisdiction, the court must decide a legal issue. *Brooks v. Arlington Hosp. Ass'n*, 850 F.2d 191, 196 (4th Cir. 1988). Absent such a circumstance, the resulting judgment precludes relitigation of that same issue in a subsequent suit under the doctrine of direct or collateral estoppel. *Id.*

In Coastal's prior federal action, the court concluded that the plain language of the Interstate Commerce Act specifically excepted from coverage pipeline carriers transporting water, gas, or oil. The court further concluded that, because only common carriers subject to the Interstate Commerce Act are required to issue bills of lading, and oil pipeline carriers are not subject to the Interstate Commerce Act, the Pomerene Bills of Lading Act did not apply to oil pipeline carriers. Alternatively, the court discussed the inapplicability of the Pomerene Bills of Lading Act by construing what was meant by "transportation" under the Act. Shell contends that, because the federal district court construed the meaning of the term "transportation," and that such construction by the federal court appears to conflict with some of the findings made by the state district court, the doctrine of collateral estoppel applies. We disagree.

When the federal court determined it did not have subject matter jurisdiction under the Interstate Commerce Act and Pomerene Bills of Lading Act on narrow grounds, any findings beyond those necessary to make that decision are not "actually litigated" or "necessary to the outcome," and therefore, do not have collateral estoppel or res judicata consequences. *See Jack Faucett Assoc., Inc. v. American Tel. & Tel. Co.*, 744 F.2d 118, 125 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985).

Shell's second point of error is overruled.

In its points of error three and four, Shell contends that it had no legally enforceable duty to Coastal, and that there was no evidence or insufficient evidence to demonstrate a breach of a legally enforceable duty to Coastal.

Coastal asserted claims against Shell on the basis of breach of common carrier duties, breach of contract, breach of tariff, negligent bailment, and common-law negligence. Although the trial court's conclusions of law appear to base Shell's liability upon all of Coastal's asserted claims, its judgment appears to be based primarily upon breach of contract and common-law negligence by Shell.

Shell first contends that, as a matter of law, it had no legally enforceable duty to Coastal because Shell's activities in this matter were "entirely gratuitous" in its relations with Coastal, and it had no contract with Coastal. It points out that Coastal did not deliver the oil to Shell, did not pay a tariff to Shell to transport the oil, was never in possession of the oil, and was not the owner of the oil when it was delivered to Shell. It argues that, even if its doing business as a common carrier can be considered as an offer to transport oil for third parties, and even if Coastal's notification to it that Coastal would be delivering oil to Shell was considered an acceptance, there was a lack of consideration for a contract. Shell claims that its computer system, which kept track of the trades as well as to whom the oil was to be delivered, was a mere gratuitous "bookkeeping record" for the benefit of its traders, and that Coastal's claim of contract fails for want of consideration.

There is no disagreement between the parties that to have an enforceable contract, there must be an offer, an acceptance, and consideration. They disagree over whether there was consideration under the facts of this case.

It is elementary contract law that a valuable consideration may consist of either a benefit to the promisor or a loss or a detriment to the promisee. *Jennings v. Radio Station KSCS, 96.3 FM, Inc.*, 708 S.W.2d 60, 61 (Tex.App.—Fort Worth 1986), *rev'd on other grounds*, 750 S.W.2d 760 (Tex.1988). Applying this basic law to the facts of the present case, the evidence shows that Shell had assumed the responsibility of keeping its traders informed of any "mismatches" in the names of the par-

ties to whom the oil was consigned. Coastal relied upon this service, and when Shell failed to discover that the oil was to have been delivered to Basin, rather than to Basin Refining, Coastal lost its option to cancel the trade or to take other steps to protect itself. This was all to Coastal's detriment. We hold that there was a legally enforceable contract between Shell and Coastal. We further hold that the failure of Shell's employees to discover and inform Coastal that there was a mismatch of nominations was a breach of a legally enforceable duty owed by Shell to Coastal.

Although Shell argues no evidence and insufficiency of the evidence, it has not specifically asserted points of error with respect to the trial court's findings of fact, nor directed our attention to evidence in the record, by page or otherwise, that controverts the court's findings. Under such circumstances, the trial court's findings must be accepted as conclusive. *See Looney v. Gibraltar Sav. Ass'n*, 695 S.W.2d 336, 340 (Tex.App.—Amarillo 1985, no writ.).

Shell's points of error three and four are overruled.

In its point of error five, Shell complains that there was no evidence or insufficient evidence that any duty breached by Shell proximately caused damage to Coastal. In its point of error six, Shell contends that there was no evidence or insufficient evidence to support allocating less than 51% of the responsibility in this matter to Coastal. Shell combined points of error five and six in its brief and, for purposes of convenience, we will follow this same procedure.

In deciding a "no evidence" point, an appellate court must consider only the evidence and the inferences tending to support the finding, and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988). On the other hand, in deciding a factual "insufficiency of the evidence" point of error, we are required to consider all the evidence in deciding the question. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

■ The record shows that Shell designed a system specifically to prevent the type of problems that arose in the instant case. Shell and its customers relied on that system. That system failed when Coastal's directions, to Shell to deliver the oil to Basin, were not followed. It also failed when Shell did not notify Coastal of the mismatch of nominations. The trial court found that these failures were proximate causes of Coastal's damage. This is sufficient probative evidence to support the trial court's findings that Shell breached contractual and common-law duties that were proximate causes of damage to Coastal.

■ Shell next contends that there was no evidence, or insufficient evidence, to support the trial court's finding allocating less than 51% of the responsibility in this matter to Coastal. It argues that Coastal failed to identify its customer when it made the trade; that Coastal became aware that it had traded the oil to Basin Refining instead of Basin about May 14, 1981; that, although Coastal was aware of its mistake in mid-May, it did nothing to correct its mistake during that month, except to contact Basin Refining several times seeking letters of credit from Basin Refining. It asserts that Coastal could not have relied upon Shell's "transaction letter" to identify who Coastal's customer was because the letter was not issued until almost a month after Coastal became aware that the oil had been traded to Basin Refining not Basin. For these reasons, Shell contends that Coastal's negligence was more than 51% of the proximate cause of Coastal's damages.

Coastal concedes that it initially failed to identify its customer, billed the wrong customer, and later became aware that Basin Refining was the party with whom it had made the trade. However, it contends that these facts are, in effect, immaterial, in view of the fact that if Shell had delivered the oil to Basin, as directed by Coastal, the problem would not have occurred. Coastal asserts that if its directive had been followed, Basin could have purchased or refused to purchase the oil. In the latter event, Coastal states it could have made

other disposition of the oil. It points out that, when it billed Basin for the oil, Basin denied purchasing or receiving the oil but did put up security until it was established that Basin had not been involved in the transaction. Thus, Coastal contends that the trial court did not err in finding that Shell's negligence was a proximate cause of at least 50% of Coastal's damages.

The trial court found that Shell's negligence was the proximate cause of Coastal's damages as follows:

(1) In offering to implement "in-line transfers" when it knew or should have known that it did not have the ability to do so carefully and properly.

(2) In failing to design a system for implementing "in-line transfers" that would prevent the possibility of misdeliveries.

(3) In failing to confirm "in-line transfer" transactions prior to the movement of the crude oil, thereby making it impossible for those engaging in such transactions to determine whether a mistake may have occurred in time to rectify any mistake.

(4) In failing to warn members of the public such as Coastal that the system Shell designed for implementing "in-line transfers" was susceptible to error and thereby lulling the public into the erroneous belief that those participating in "in-line transfers" need only follow Shell's instructions for the transaction to be implemented properly.

(5) In failing to diligently follow its own procedures to program its computer in such a way that the computer could distinguish between Basin and BRI [Basin Refining], which procedure, if followed, would have prevented the misdelivery at issue in this litigation.

(6) In designing a system that depended upon such an inherently unreliable process as observations of letterheads for distinguishing among various trading entities.

The trial court found that Coastal was negligent, and that such negligence was the proximate cause of its loss, by failing to ascertain that the entity intending to

purchase the crude was Basin Refining, not Basin.

The trial court, in its conclusion of law seven, states as follows:

> The court is of the opinion that the acts and omissions of Shell were 50% responsible for the loss, while the acts and omissions of Coastal and its partners, Basin and BRI [Basin Refining] were also 50% responsible.

 As we have noted, when a party attacks the sufficiency of the evidence to support a factual finding, a court of appeals must examine all of the evidence. *Lofton*, 720 S.W.2d at 805. Having considered and weighed the evidence, we should set aside the finding of fact only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). The Texas Supreme Court has stated, on numerous occasions, that a court of appeals may not substitute its opinion for that of the trier of fact merely because it might have reached a different fact conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988).

The assignment or finding of the percentage or degree of fault when there are two or more proximate causes of an event is often a difficult task. The present case is a good example. Here the evidence showed serious mistakes in judgment. The trial court obviously had a difficult task in determining fault and apportioning liability. After the trial court was presented the evidence and heard arguments of counsel, it took the case under advisement. At a later date, no decision having been made by the court, it requested that counsel reargue the case. It then made its decision and entered judgment.

Although this Court might not have assigned the same percentage of fault to the parties as the trial court, that is neither our prerogative nor the issue before us. *See Herbert*, 754 S.W.2d at 144. The question we must answer is whether the trial court's finding, that the acts and omission of Shell were 50% responsible for the loss sustained by Coastal, is so against the great weight and preponderance of the evidence that it is

clearly wrong and unjust. After considering and weighing the evidence in the record, we do not find that the trial court's determination of causation was so clearly unjust and wrong as to require a reversal and retrial.

Shell's points of error five and six are overruled.

 In its point of error seven, Shell contends that the trial court erred in using an erroneous measure of damages to calculate Coastal's losses. The parties agree that the proper measure of damages is the fair market value of the misdelivered oil. They disagree on the type of "market" used to prove and calculate Coastal's damages.

To prove its losses, Coastal offered into evidence the Shell and Exxon posted prices for the month of May 1981. Shell argues that those prices were inapplicable because they were prices for oil sold pursuant to long-term contracts in April and May of 1981 and did not consider "spot" market prices. The Shell crude oil price bulletin introduced into evidence by Coastal states:

> Effective 7:00 a.m. on May 1, 1981 subject to change without notice ... Shell Oil will pay the following posted prices per barrel....

Shell's bulletin contains no language concerning long-term contracts and does not support Shell's contention. Shell also argues that there were two "market prices" in May 1981: the long-term contract market price, and the "spot" market price. It contends that the court should have taken into consideration the "spot" market prices. Shell contends that it was the burden of Coastal to put on evidence of the "spot" market prices.

We disagree with Shell's contention that it was Coastal's burden to put on evidence of "spot" market prices. Coastal put on its evidence concerning the market value of the misdelivered oil. If Shell wished to put on controverting evidence that this was not the proper market value to be considered by the court in assessing Coastal's damages, it could have done so. There is no evidence in the record concerning what oil

was selling for on the "spot" market. There is nothing in the record to show that the "spot" market price was either higher or lower at the time the transaction made the basis of this lawsuit transpired. By failing to present controverting evidence of market prices, Shell did not give the trial court an opportunity to evaluate its claim. Shell has failed to show that the trial court used an erroneous measure in calculating the market value of the oil.

Shell's point of error seven is overruled.

■ In its point of error eight, Shell alleges that the trial court erred in failing to apply the recovery of $700,000 received from Basin Refining as a credit against the damages assessed against Shell. Shell's sole contention in this regard is that, during oral argument before the trial court, Coastal's counsel judicially admitted that Shell should receive a credit for the amounts received from the Basin Refining bankruptcy. Coastal's counsel's statements were as follows:

> We don't think that under the modern approach of the election of remedies we are limited to a claim against Basin Refining, obviously, we are not entitled to a double recovery but we certainly think that these amounts need to be a credit to any liability that the court might impose on Shell.

■ For an act to constitute a "judicial admission" it must: (1) be a formal act during the course of a judicial proceeding; (2) dispense with the necessity to produce evidence and the submission of an issue to the fact finder; (3) must be deliberate, clear, and unequivocal; and (4) must stand unretracted. *Texas Processed Plastics, Inc. v. Gray Enter., Inc.*, 592 S.W.2d 412, 415–16 (Tex.Civ.App.—Tyler 1979, no writ).

We do not consider Coastal's counsel's remarks to rise to the level of a "judicial admission" for several reasons. First, counsel's remarks did not clearly and unequivocally show that Shell was entitled to receive an offset of $700,000. When taken in context, counsel's remarks could be construed as simply advising the court that Coastal was not seeking a double recovery. Secondly, all evidence had then been presented, and counsel's remarks did not specifically advise the court that no issue existed as to whether an offset should be allowed. Finally, Coastal has retracted any inference that counsel's remarks are a "judicial admission" by contesting Shell's allegation, and by denying any intent to make a judicial admission.

Notwithstanding our rejection of Shell's contention of "judicial admission" by Coastal, there are other factual matters that must be considered in determining whether the trial court erred in failing to give a $700,000 credit when computing Coastal's damages.

■ Coastal went to trial on its second amended petition. In that petition, Coastal sought damages of $3,524,700. The parties stipulated before the trial court and this Court that Coastal had received $700,000 (we will accept that stipulation although the evidence shows a slightly lower figure) from the bankruptcy court for its claim against Basin Refining for nonpayment on the purchase of the same 93,000 barrels of oil involved in the instant lawsuit. Coastal had no other claims against Basin Refining in the bankruptcy proceeding.

Coastal appears to contend that, because the trial court held Coastal, Basin, and Basin Refining, collectively, 50% at fault, without designating the specific percentage of fault of each of the three, this prevents Coastal from making a double recovery and a credit of $700,000 should not be allowed.

We do not agree with Coastal's reasoning. The trial court found Shell 50% at fault and the three other parties, collectively, 50% at fault. Under our facts, it is of no consequence what percentage of the 50% fault the other three parties had. Regardless of the percentage of fault, within the 50% found by the court for the three parties, it would not change the amount of Shell's fault.

As to Coastal's damages, it proved, and the court found, that the market value of the misdelivered oil was $3,524,700. The parties stipulated, and the court found, that Coastal had recovered $700,000 from its claim against Basin Refining on this same

loss. This $700,000 recovery was made prior to this matter being submitted to the trial court for a decision. Thus, at the time of trial, Coastal's loss was $2,824,700 ($3,524,700 less $700,000) not the $3,524,700 found by the court. When we apply Shell's 50% fault factor to Coastal's damages of $2,824,700, we find that the trial court erred in its computations and hold that Coastal's recovery against Shell should have been $1,412,350.

Shell's eighth point of error is sustained.

■■■ In its last two points of error, Shell alleges that the trial court erred in awarding prejudgment interest at the rate of 10% compounded daily because (1) such rate is improper for contractual interest in Texas, and (2) such rate is unconstitutional under article XVI, section 11 of the Texas Constitution.

Article XVI, section 11 of the Texas Constitution reads as follows:

The Legislature shall have authority to classify loans and lenders, license and regulate lenders, define interest and fix maximum rates of interest; provided, however, in the absence of legislation fixing maximum rates of interest all contracts for a greater rate of interest than ten per centum (10%) per annum shall be deemed usurious; provided, further, that in contracts where no rate of interest is agreed upon, the rate shall not exceed six per centum (6%) per annum. Should any regulatory agency, acting under the provisions of this Section, cancel or refuse to grant any permit under any law passed by the Legislature; then such applicant or holder shall have the right of appeal to the courts and granted a trial de novo as that term is used in appealing from the justice of the peace court to the county court.

Pursuant to the authority granted to the legislature in section 11, the legislature enacted Tex.Rev.Civ.Stat.Ann. art. 5069-1.-03 (Vernon 1987), which reads as follows:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commenc-ing on the thirtieth (30th) day from and after the time when the sum is due and payable.

Shell's argument is basically that this is a suit on a contract, that any damages received by Coastal were readily ascertainable, and, because the parties had not agreed upon a rate of interest, the rate of interest should not exceed 6% per annum as provided by article 5069-1.03. In the alternative, Shell contends that, even if Coastal's damages were not ascertainable, the constitutional limit in article XVI, section 11 does not make a distinction between ascertainable damages and unascertainable damages, and Tex.Rev.Civ.Stat.Ann. art. 5069-1.05, sec. 2 (Vernon Supp.1990) is unconstitutional to the extent that it authorizes prejudgment interest rates in excess of 6% on a contract. Article 5069-1.05, section 2 reads as follows:

Except as provided in Section 1 of this article, all judgments, together with taxable court costs, of the courts of this state earn interest, compounded annually, at the rate published by the consumer credit commissioner in the Texas Register. The consumer credit commissioner shall compute on the 15th day of each month the judgment interest rate by taking the auction rate quoted on a discount basis for 52-week treasury bills issued by the United States government as published by the Federal Reserve Board on the most recent date preceding the date of computation. The interest rate so computed shall be the judgment rate, except that if the rate so computed is less than 10 percent, the judgment interest rate shall be 10 percent, and if it be more than 20 percent, the judgment interest rate shall be 20 percent. The rate established on that computation date shall be the interest rate on judgments for the next calendar month.

The fallacy we find in Shell's reasoning commences with Shell's oversimplification of the facts. The trial court's judgment was not based solely on the original contract between Coastal and Shell. The court established Shell's liability based upon this original contract and common-law negli-

gence. However, Coastal's damages were based upon the market value of oil sold in another contract, i.e., Coastal to Basin Refining, and the comparative negligence of the parties involved in both contracts. The trial court found that Coastal's damages were not ascertainable from the face of the contract. This finding has not been attacked by Shell, although in its argument it contends that damages were ascertainable. We agree with the trial court's finding to the extent that damages were not ascertainable from the face of the contract between Coastal and Shell for transportation of the oil. This Court finds that because tort law was involved in the determination of the resolution of this case, this is not a pure contract case limited only to contract law. Thus, we find no merit to Shell's contention that the trial court should have awarded only the 6% interest provided in Tex. Const. art. XVI, sec. 11, which addresses itself only to contract law. This same reasoning applies to our rejection of Shell's argument concerning article 5069–1.05, section 2.

Unless otherwise specifically indicated by our constitution or statutes, prejudgment interest shall accrue at the prevailing rate that exists on the date the judgment is rendered according to the provisions of article 5069–1.05, section 2. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554 (Tex.1985). Our supreme court continued to follow the standards set in *Cavnar* in the case of *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 931 (Tex.1988).

Shell attempts to distinguish the *Cavnar* and *Perry* cases from the case at hand by stating that the facts in the present case show that the damages were ascertainable. We have heretofore determined and held that the damages were not ascertainable from the face of the contract or contracts. We, therefore, overrule this contention of Shell.

Shell's points of error nine and ten are overruled.

The judgment of the trial court is reformed to award Coastal a judgment of $1,412,350, and in all other respects the judgment of the trial court is affirmed.