ACS INVESTORS, INC.,
et al., Appellants,

v.

Thomas McLAUGHLIN, et al., Appellees.

No. 05–93–00528–CV.

Court of Appeals of Texas,
Dallas.

Oct. 31, 1995.*

---

* Editors Note: Majority Opinion originally designated not for publication; dissenting opinion designated for publication and by operation of Tex. Rules App.Proc. 90(c) both opinions are published.

David E. Keltner, Alan Wright, LaDawn H. Conway, Haynes & Boone, LLP, A.B. Conant, Jr., Raymond P. Harris, Jr., Conant, Whittenburg, Whittenburg & Schachter, Dallas, for appellants.

Joe Chumlea, John M. Phalen, Jr., Bragg, Chumlea, McQuality, Smithers & Curry, Dallas, for appellees.

Before OVARD, MALONEY, and DEVANY, JJ.

## OPINION

OVARD, Justice.

ACS Investors, Inc. (ACS), Affiliated Computer Services, Inc. (ACSFS), Trans-First Corporation (TransFirst), Darwin Deason, and J. Livingston Kosberg appeal a jury verdict in favor of Thomas McLaughlin and John Lazovich on claims of tortious interference with a contract and conspiracy to tortiously interfere with a contract. The jury awarded McLaughlin and Lazovich $3,000,000 in actual damages, $1,500,000 in exemplary damages, and prejudgment interest from the date of interference in excess of $1,500,000. Appellants contend on appeal that: (A) the evidence was legally and factually insufficient to establish the existence of the contract rights with which they allegedly interfered; (B) the evidence was legally and factually insufficient to establish that they performed any intentional act of interference; (C) the evidence was legally and factually insufficient to establish that they performed any act of interference; (D) the trial court erred in entering judgment on the verdict because the evidence established as a matter of law that they were justified in entering into their contract; (E) the evidence was legally and factually insufficient to establish that any act of interference proximately caused the damages awarded to McLaughlin and Lazovich; (F) the evidence was legally and factually insufficient to establish McLaughlin and Lazovich incurred $3,000,000 in actual damages; (G) the trial court erred by improperly instructing the jury about the intent required to find tortious interference; (H) the trial court erred by entering judgment on the award of prejudgment interest for a period of over three years before McLaughlin and Lazovich could have sustained any injury; and (I) the trial court erred by applying prejudgment interest at a rate of 10% compounded daily. Appellants ACS, ACSFS, TransFirst, and Deason also contend that the evidence was legally and factually insufficient to establish they acted with sufficient actual malice to support an award of exemplary damages.

Appellant Kosberg additionally maintains that the trial court erred in denying his motion for judgment notwithstanding the verdict and his motion for new trial, and in rendering judgment for the plaintiffs for tortious interference because: (a) the verdict will not support a judgment for tortious interference against him; (b) jury question number one was legally incorrect and deficient; (c) the jury instruction relating to question number one was legally deficient and incomplete; (d) the trial court erred in refusing to submit either the question and instruction proposed by appellants or those proposed by appellees; (e) the same errors in question number one and its related instruction exist in question number two; (f)

no evidence exists that he intentionally interfered with appellees' contract; (g) because no evidence exists that he intentionally interfered with appellees' contract, he cannot be liable as a conspirator as a matter of law; (h) no evidence exists that his action or inaction caused any tortious interference with appellees' contract; and (i) the uncontroverted evidence shows that he, as an officer, acted in his company's best interests, and thus he is immune from liability for tortious interference with a contract as a matter of law. For the following reasons, we affirm the trial court's judgment.[1]

## FACTS AND PROCEDURAL HISTORY

### A. AMS II

In 1986, McLaughlin and Lazovich were partners in Automated Management Services II (AMS II). McLaughlin and Lazovich formed AMS II to create and manage systems to authorize and distribute government benefits. Over the years, the general concept for such a system has become known in the industry as Electronic Benefit Transfer (EBT).

McLaughlin had over seventeen years of government service. Most of the government programs he worked with involved public welfare, food stamps, or child support. McLaughlin's previous government work afforded him the contacts, access, and credibility to talk with prospective government clients. McLaughlin was involved in the day-to-day operations of the partnership, while Lazovich provided the monetary resources necessary to operate the business.

AMS II entered into contracts with various state and county governments across the country. Under these contracts, AMS II investigated ways in which its clients could set up EBT systems for their government programs. McLaughlin planned to use electronic funds transfer technology and point-of-sale technology to set up these systems.[2] He contemplated using an already existing auto- matic teller machine network, due to the prohibitive cost of building such a network. Therefore, McLaughlin planned to make a business deal between AMS II and a bank ATM network to provide the necessary technology.

### B. First Texas and the McLaughlin Agreement

#### 1. The Agreement

Ultimately, AMS II entered into an agreement with First Texas, the company that owned the MoneyMaker ATM network. This agreement is evidenced by a letter agreement (the McLaughlin Agreement) and by a purchase agreement that references and incorporates the letter agreement.

Under the McLaughlin Agreement, McLaughlin and Lazovich agreed to sell AMS II to First Texas. At that time, AMS II's assets consisted of the partners' ideas and the contracts into which AMS II had already entered. Upon the sale to First Texas, AMS II became the AMS division of First Texas Government Services (FTGS), a division of MoneyMaker EFT Services (MoneyMaker), which was itself a division of First Texas. Before the McLaughlin Agreement, First Texas did not have a government services business.

First Texas paid $400,000 in cash upon the signing of the McLaughlin Agreement in 1986. The McLaughlin Agreement also provided that McLaughlin and Lazovich had an option at the end of five years to purchase 49% of the AMS division for $100,000 (the Purchase Option). Further, the McLaughlin Agreement provided that, when McLaughlin and Lazovich exercised the option, First Texas had an obligation to buy the 49% ownership back for a formula price (the Buyback Price). The Buyback Price formula was based on the gross revenues of FTGS.

Paragraph 5 of the McLaughlin Agreement provided two ways in which First Texas

---

1. Appellees brought five cross-points of error for submission only in the event this Court reversed the trial court's judgment. Because we affirm the trial court's judgment, we need not address these points.

2. Electronic funds transfer technology is the ·technology used in automatic teller machine systems. Point-of-sale technology is the technology used by retail stores and restaurants for electronic credit card authorization.

could buy the Purchase Option early. If First Texas took FTGS public, it could buy the option for $750,000 plus a formula percentage. In any other instance, First Texas could buy the option for $3,000,000.

Under paragraph 5, First Texas could separately incorporate the AMS division, MoneyMaker, or FTGS without incurring any further obligation to McLaughlin and Lazovich. However, under paragraph 10, if First Texas withdrew from the business without selling it, or if First Texas wanted to accept a bona fide offer to purchase the business, then paragraph 10 of the McLaughlin Agreement required First Texas to give McLaughlin and Lazovich notice and an opportunity to make an offer to purchase the AMS division. First Texas was not required to accept McLaughlin and Lazovich's offer.

### 2. McLaughlin's Employment at the GSD

Before signing the McLaughlin Agreement, McLaughlin became the director of marketing and product development for the government and health care division of MoneyMaker. At that time, MoneyMaker consisted of three components: (1) the ATM network; (2) the government services division (GSD); and (3) a commercial credit card group. McLaughlin's position in the GSD entailed two major responsibilities. First, he worked with the GSD's software staff to develop the software necessary to run the EBT services. Second, he marketed and sold the EBT services. For the first year of his employment, McLaughlin was the only person marketing the EBT services for Money-Maker. During McLaughlin's employment, the GSD entered into several contracts with various government agencies.

### C. First Texas and ACS: The P & C Agreement

By the end of 1986, First Texas and its subsidiaries were insolvent by more than $118,000,000. By the end of 1987, First Texas had a deficit of $463,000,000. One of the subsidiaries, First Texas Computer Corpora-

tion (FTCC), accounted for $12,000,000 of the 1987 losses. MoneyMaker also was incurring losses, as was the GSD.

In July 1988, First Texas entered into a Purchase and Contribution Agreement (P & C Agreement). Appellants contend this agreement consolidated MoneyMaker, the GSD, and the FTCC into a newly formed subsidiary of First Texas: ACS. Appellants assert Kosberg, First Texas' chairman, recruited Deason to join ACS as its chief executive officer. However, McLaughlin and Lazovich contend Deason had formed ACS before the parties entered into the P & C Agreement. Furthermore, McLaughlin and Lazovich maintain Deason contacted Kosberg in order to acquire First Texas' ATM network (MoneyMaker), EBT business (the GSD), and data processing business (FTCC).

To evaluate the assets of the ATM network, EBT business, and data processing business, Deason hired an auditing firm to perform a due diligence investigation. In its report to Deason, the auditing company identified the McLaughlin Agreement as a "critical issue" through which "McLaughlin has an option to repurchase a significant portion of Government Services and Health Care business in 1990 [sic]." The auditing company recommended referring the matter to legal counsel.

Schedule 10.10 of the P & C Agreement identified "Conflicts of Purchase Agreement with other material agreements of [First Texas] or the Subsidiaries." The only agreement recorded in Schedule 10.10 is the McLaughlin Agreement.[3] Schedule 10.10 also listed the third-party consents and approvals required by the P & C Agreement. This list included "AMS Partners II with respect to government business transfer."

Paragraph 7.1 of the P & C Agreement provided for the Purchase Option's termination. The paragraph, entitled "Agreement with McLaughlin and Lazovich," acknowledged that the McLaughlin Agreement remained with First Texas following the P & C Agreement. Furthermore, the paragraph

---

**3.** Schedule 10.10 refers to the McLaughlin Agreement as the "FTSA and AMS Partners II contract."

provided that First Texas would "use its best efforts to cause the McLaughlin Agreement to be terminated without any further obligation or liability among the parties hereto." First Texas also agreed to indemnify the Deason Group and ACS from any liability related to the McLaughlin Agreement in the event the McLaughlin Agreement "[could] not be terminated by mutual agreement among the parties thereto."

To effect the P & C Agreement, First Texas sold substantially all of MoneyMaker's and the GSD's assets to TransFirst Corporation, a wholly owned subsidiary of First Texas. The McLaughlin Agreement was not among the assets sold by First Texas; instead, First Texas expressly retained the McLaughlin Agreement. Next, First Texas sold all of TransFirst's and FTCC's stock to Gibraltar Savings Association, another wholly owned subsidiary of First Texas. Finally, Gibraltar Savings Association transferred all of the TransFirst and FTCC stock to ACS in return for 50.1% of ACS' common stock and 100% of ACS' preferred stock. Kosberg and several other First Texas officers received stock options in ACS. After these transactions had taken place, ACS owned the government services EBT business, while the liabilities of the McLaughlin Agreement remained with First Texas.

### D. The P & C Agreement's Effect on the McLaughlin Agreement

McLaughlin and Lazovich were not notified of the P & C Agreement or the transactions until after they had taken place. McLaughlin learned of the transactions at a staff meeting during which Deason announced ACS' purchase of the GSD. When McLaughlin spoke with Deason after the meeting, Deason told him that ACS had not acquired the McLaughlin Agreement.

McLaughlin continued his employment for nine months, working for TransFirst to develop the EBT business.[4] He notified First Texas that the McLaughlin Agreement re-

quired that he and Lazovich receive notice and an opportunity to make a competing offer once First Texas wished to accept a bona fide offer to purchase its government services business. McLaughlin and Lazovich negotiated with First Texas to receive compensation for their Purchase Option rights. The parties reached an agreement under which McLaughlin and Lazovich would receive $1,000,000 for the Purchase Option. Meanwhile, the Federal Home Loan Bank Board (FHLBB) had placed First Texas under a supervisory agreement. The supervisory agreement required First Texas to obtain federal regulators' approval of its agreement with McLaughlin and Lazovich. The agreement was not approved before the FHLBB placed First Texas into receivership.

The FSLIC, as receiver, sold most of First Texas' assets to First Gibraltar Bank (First Gibraltar). The McLaughlin Agreement was not among the assets sold. The FSLIC later repudiated the McLaughlin Agreement.

Appellants contend the Purchase Option would have had no value at the end of the five-year period. They contend the Buyback Price formula calculations yielded a negative number. Appellants maintain the Buyback Price's negative value indicates that the Purchase Option would have had no value and that McLaughlin and Lazovich would not have exercised it. However, McLaughlin and Lazovich contend they attempted to exercise their Purchase Option rights in July 1991 without success.

### E. Procedural History

McLaughlin and Lazovich sued ACS, ACSFS, TransFirst, Deason, and Kosberg on claims of tortious interference with a contract, conspiracy to tortiously interfere with a contract, breach of contract, fraud, and unjust enrichment. McLaughlin and Lazovich also sought a declaratory judgment to impose on ACS an equitable lien arising from the Purchase Option.[5]

---

**4.** At the end of nine months, McLaughlin resigned.

**5.** Appellees filed a motion for summary judgment on the breach of contract, fraud, unjust enrich-

ment, and declaratory judgment actions. Appellants also filed a motion for summary judgment on those claims. The trial court granted appellants' motion and denied appellees' motion. The remaining claims were tried to a jury.

The first question in the jury charge asked if any appellant had interfered with appellees' contract. The question contained the following definition:

One interferes with the contract of another if (1) there was a contract subject to interference; (2) there was an act of interference that was willful and intentional; (3) such intentional act was a proximate cause of plaintiffs' actual damages, if any.

The second question asked if any appellant had engaged in a conspiracy to interfere with appellees' contract. The second question gave the same definition for interference with a contract that the first question contained. The jury found that each appellant had interfered with and engaged in a conspiracy to interfere with appellees' contract.

## STANDARD OF REVIEW: SUFFICIENCY OF THE EVIDENCE

■ Several of appellants' points of error challenge the evidence's factual and legal sufficiency to support the judgment. A factual sufficiency point of error requires us to consider and weigh all the evidence. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The jury, as the trier of fact, has the responsibility to judge the witnesses' credibility, to assign the weight to the testimony, and to resolve any inconsistencies in the testimony. *Perry v. Perry Bros.,* 753 S.W.2d 773, 776 (Tex.App.—Dallas 1988, no writ). Therefore, we may not substitute our judgment for that of the jury if the challenged finding is supported by some evidence of probative value and is not against the great weight and preponderance of the evidence. *Id.* In a factual sufficiency review, we will not set aside the verdict unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176.

■ On the other hand, a legal sufficiency point of error requires us to examine only the evidence that supports the judgment. *West End API, Ltd. v. Rothpletz,* 732 S.W.2d 371, 374 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). We must disregard all evidence favoring the complaining party unless that evidence is uncontroverted. *Id.* If more than a

scintilla of evidence exists to support the jury finding on a particular fact issue, then the legal sufficiency challenge fails. *Spangler v. Jones,* 861 S.W.2d 392, 396 (Tex.App.—Dallas 1993, writ denied). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the amount of evidence is no more than a scintilla. However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then some evidence exists and the challenge fails. *See id.*

## ELEMENTS OF TORTIOUS INTERFERENCE WITH A CONTRACT

■ In Texas, a party bringing suit for tortious interference with a contract must prove four elements: (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) the intentional act proximately caused the plaintiff's damage; and (4) actual damage or loss occurred. *Juliette Fowler Homes v. Welch Assocs.,* 793 S.W.2d 660, 665 (Tex.1990). Once the plaintiff establishes a prima facie case of tortious interference, the defendant can prevail only by proving his act was either justified or privileged. *Bellefonte Underwriters Ins. Co. v. Brown,* 663 S.W.2d 562, 573 (Tex.App.—Houston [14th Dist.] 1983), *aff'd,* 704 S.W.2d 742 (Tex.1986); *Armendariz v. Mora,* 553 S.W.2d 400, 405 (Tex.Civ. App.—El Paso 1977, writ ref'd n.r.e.). A plaintiff can recover exemplary damages if he can show the interference was malicious. *Bellefonte Underwriters,* 663 S.W.2d at 573.

■ The first element of tortious interference with a contract requires that a valid contract exist. *Juliette Fowler,* 793 S.W.2d at 664. An unenforceable contract may provide the basis for a tortious interference claim if the contract is not void. *Id.* Thus, unenforceability of a contract, without more, is not a defense to an action for tortious interference. *Id.*

■ The second element of tortious interference with a contract requires a willful and intentional act of interference. *Id.*

Contractual interference encompasses actual inducement or procurement of a contract breach and all other invasions of contractual relations. Accordingly, such interference includes any act which retards, makes more difficult, or prevents performance. *Bellefonte Underwriters*, 663 S.W.2d at 573; *Tippett v. Hart*, 497 S.W.2d 606, 611 (Tex.Civ. App.—Amarillo), *writ ref'd n.r.e.*, 501 S.W.2d 874 (Tex.1973). Interference with a contract rises to a tortious level only if it is intentional. *See Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992).

## CONTRACT RIGHTS UNDER THE McLAUGHLIN AGREEMENT

In ACS's [6] first and second points of error, and Kosberg's third point, appellants contend the evidence was legally and factually insufficient to establish the existence of the contractual rights with which they allegedly interfered.[7] Appellants maintain McLaughlin had no right under the McLaughlin Agreement to: (1) receive advance notice of the P & C Agreement; (2) receive $3,000,000 for a mandatory buy-out following the P & C Agreement; or (3) purchase 49% of First Texas' EBT business. Appellants assert McLaughlin, therefore, had no contract rights on which to base his claim for intentional interference.

McLaughlin [8] alleged ACS interfered with his rights under the McLaughlin Agreement. The jury charge did not state with which contractual rights McLaughlin alleged interference. Therefore, we cannot sustain ACS' point of error unless the evidence is insufficient to establish that McLaughlin had any contractual rights with which ACS could have interfered.

The McLaughlin Agreement made written provision for an option for McLaughlin to purchase 49% ownership of the AMS Division in 1991 for $100,000 (the Purchase Option).

Another provision imposed the obligation on First Texas, upon exercise of the Purchase Option, to reacquire the 49% ownership for either a formula price or $3,000,000. The Purchase Option was not conditioned on the reacquisition. The Purchase Option had to be exercised before First Texas' obligation arose. Thus, First Texas' failure to perform its obligation would not nullify the Purchase Option.

ACS agrees that McLaughlin had the right under the Agreement to acquire 49% ownership in the AMS Division. However, ACS argues that the right was not subject to interference. ACS maintains the AMS Division was fictional because it had no assets. Furthermore, ACS contends the division was merely an accounting construct to determine the amount First Texas would pay under the agreement to perform its obligation to repurchase the "ownership." ACS argues the Purchase Option and repurchase obligation combine to form a contract provision for a money transfer from First Texas to McLaughlin, and that McLaughlin, consequently, has no right under the Agreement.

### A. Applicable Law

■ Courts do not resort to arbitrary rules of construction where unambiguous language clearly expresses the parties' intentions. *Citizens Nat'l Bank v. Texas & P. Ry. Co.*, 136 Tex. 333, 150 S.W.2d 1003, 1006, *cert. denied*, 314 U.S. 656, 62 S.Ct. 109, 86 L.Ed. 526 (1941). The court must construe a contract in accordance with its language. Where the contract terms are free from ambiguity and do not conflict with the law, those terms establish the parties' rights under the contract. *Id.* Courts attempt to construe contracts so as to avoid rendering any of their terms meaningless. *Vest v. Gulf Ins. Co.*, 809 S.W.2d 531, 533 (Tex.App.—Dallas 1991, writ denied).

---

6. ACS, ACSFS, TransFirst, and Deason filed a single brief. Unless otherwise noted we will refer to these parties as "ACS".

7. In his third point of error, Kosberg adopts ACS's first, second, third, fourth, fifth, and eleventh points of error. Any reference to those points of error, raised by ACS, applies to Kosberg's third points as well.

8. Because McLaughlin's and Lazovich's rights were equal under the McLaughlin agreement, any reference to McLaughlin's rights applies to Lazovich as well.

An option granted in a contract is a contract right. *See Wall v. Trinity Sand & Gravel Co.,* 369 S.W.2d 315, 317–18 (Tex. 1963) (construing option provision under contract law); *Sinclair Ref. Co. v. Allbritton,* 147 Tex. 468, 218 S.W.2d 185 (1949) (purchase option provision in lease agreement conferred contract rights on lessee); *Corsicana Petroleum Co. v. Owens,* 110 Tex. 568, 222 S.W. 154, 155 (1920) (contract granted the "right or option" to surrender lease under certain conditions). An option's purpose is to enable the grantee to exercise the particular right or not, at his election. *Corsicana Petroleum Co.,* 222 S.W. at 155. Its value consists of that privilege. *Id.* In many contracts, only one side makes the option promise. The unilateral character of the option agreement is inconsequential to a contract's validity. *Id.* Property owners have the power to make valid contracts granting option rights in their property. In turn, the courts have a duty to uphold and enforce such contracts. *Id.*

### B. "Fictional" Nature of Option

The McLaughlin Agreement contains a provision granting McLaughlin the Purchase Option. The option provides that he may purchase 49% ownership in the AMS Division in 1991 for $100,000, at his election. The option derives value from that privilege. *See Corsicana Petroleum,* 222 S.W. at 155. First Texas, of which the AMS Division was a part, had the right to make a valid contract granting such an option. *Id.*

Nevertheless, ACS contends the evidence reveals that the option is "fictional." It advances two possible reasons for the option's illusory nature: (1) the AMS Division, which forms the subject matter of the option, had no assets; and (2) the option constitutes part of a business deal that contemplates the transfer of money only. It cites no authority in support of either proposition.

First, ACS asserts the option is fictional because the AMS Division had no assets. We cannot agree with this bare assertion. ACS provides no law that requires a business entity forming the subject matter of a contract right to have assets. The McLaughlin Agreement itself provides an example of an assetless business entity forming the subject matter of a contract right. Both McLaughlin and Kosberg testified that AMS II had no assets at the time of the McLaughlin Agreement. The McLaughlin Agreement confers upon First Texas ownership rights in AMS II. These ownership rights are not rendered invalid because AMS II had no assets. Similarly, McLaughlin's option rights under the Agreement are not invalid because the AMS Division, formerly AMS II, had no assets. The fact that the AMS Division had no assets does not defeat the option. We also note that the McLaughlin Agreement does not condition the option on the AMS Division's having assets.

Second, ACS contends the option is fictional because it is part of a business deal that contemplates the transfer of money only. ACS urges us to read the option in conjunction with First Texas' obligation to repurchase the ownership for a formula price or $3,000,000, whichever is higher. It argues the two provisions' purpose was to form an accounting structure by which First Texas would determine the payment due McLaughlin and Lazovich in 1991. It supports this statement with the assertion that the option's only value lay in the "repurchase" payment from First Texas to McLaughlin and Lazovich. It concludes the Purchase Option and repurchase obligation would be exercised simultaneously, so that the sole effect of the Option's exercise would be the money payment to McLaughlin.

The McLaughlin Agreement contains no language to support ACS' arguments. The language of the option provision is unambiguous. It does not condition the option on the exercise of First Texas' repurchase obligation.

The privilege of exercising a particular right at one's election imparts value to the option. *See Corsicana Petroleum,* 222 S.W. at 155. Additional value may arise from the subject matter that the option controls. However, even without that added worth, the option is valuable in itself. *Id.* Consequently, McLaughlin's and Lazovich's option under the Agreement has value be-

yond the potential repurchase payment from First Texas. *See id.*

We fail to see anything in the Agreement that renders the option either "fictional" or invalid. First Texas gave McLaughlin and Lazovich the right to acquire 49% ownership in the AMS Division for $100,000 in 1991. There is nothing unlawful about such a contract, and the parties were privileged to make it. *See Corsicana Petroleum,* 222 S.W. at 155. They contracted to grant the option by the instrument. We overrule ACS's first and second points of error. We overrule Kosberg's third point of error to the extent it adopts ACS's first and second points.

### INTENTIONAL ACT OF INTERFERENCE

In its third and fourth points of error, ACS asserts the evidence at trial was legally and factually insufficient to prove it committed an intentional act of interference with McLaughlin's contract rights. In its fifth point of error, ACS contends the evidence at trial was legally and factually insufficient to prove it committed an intentional act of interference by entering into the P & C Agreement.[9] In ACS's sixth point of error and Kosberg's ninth point of error, appellants contend the trial court abused its discretion by entering judgment for McLaughlin because the evidence at trial established as a matter of law that ACS was justified in entering into the P & C Agreement. In Kosberg's second point of error, he contends that there was no evidence that he intentionally interfered with the McLaughlin Agreement. Finally, in Kosberg's fifth point of error, he claims there was no evidence that he took any action that caused tortious interference with the McLaughlin Agreement. Appellants maintain that each of these points negates the possibility that McLaughlin proved the second element of tortious interference: an intentional act of interference.

■■■■■ Appellants maintain the FSLIC's repudiation of the McLaughlin Agreement provides a complete defense to any alleged interference by ACS. One can interfere with contract rights even though the original obli-

gor later becomes insolvent and unable to perform. Third parties may not interfere tortiously with performance of a contract before it is terminated. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989); *Clements v. Withers,* 437 S.W.2d 818, 821 (Tex.1969). Thus, the FSLIC's later repudiation of the Agreement does not prevent the existence of an intentional act of interference by ACS.

Appellants also contend the only evidence tending to show an intentional act of interference was evidence that ACS entered into the P & C Agreement. They maintain McLaughlin presented no evidence to show that appellants engaged in any other act which would tend to induce a breach of the McLaughlin Agreement or tend to prevent First Texas from performing any of its obligations thereunder. Kosberg additionally maintains that, even if the evidence shows that the P & C Agreement interfered with McLaughlin's and Lazovich's rights, the evidence did not show that Kosberg believed it interfered or that he took any action which caused harm.

### A. The P & C Agreement: Exercise of a Statutory Right

■■■■■ McLaughlin maintains ACS interfered with the McLaughlin Agreement by entering into the P & C Agreement itself. Appellants contend ACS was exercising its statutory right to acquire assets without acquiring liabilities. *See* TEX.BUS.CORP.ACT ANN. art. 5.10B(2) (Vernon Supp.1995). Under the defense of legal justification or excuse, one is privileged to interfere with another's contract (1) if it is done in a bona fide exercise of his own rights or (2) if he has a right in the subject matter equal or superior to that of the other party. *Sterner,* 767 S.W.2d at 691. Legal justification is an affirmative defense on which the defendant has the burden of persuasion. *Murray v. Crest Constr.,* 900 S.W.2d 342, 344 (Tex.1995); *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991).

---

**9.** Again, Kosberg adopts ACS's third, fourth, and fifth points of error in his third point of error.

Any reference to ACS's points of error applies to Kosberg's third point as well.

Appellants base their argument on their interpretation of article 5.10B(2) of the Texas Business Corporation Act. They contend the statutory right is subject only to express statutory exceptions. *Id.* They argue that a common-law tortious interference claim is not an express statutory exception. As a result, they maintain, the exercise of their statutory right cannot constitute, as a matter of law, an intentional act of interference. Alternatively, they argue the exercise of the right is privileged conduct.

 Article 5.10B of the business corporation act provides that, following certain asset acquisitions, the purchasing corporation has no liability for the selling corporation's obligations, unless the purchasing corporation expressly assumes them. TEX.BUS.CORP. ACT ANN. art. 5.10B(2) (Vernon Supp.1995). The article does not confer a "right to acquire assets without acquiring liabilities." It limits successor liability when a purchaser has *already* acquired assets without expressly assuming liabilities. *See id.; Celotex Corp. v. Tate,* 797 S.W.2d 197, 207 (Tex. App.—Corpus Christi 1990, no writ). In this case, McLaughlin does not seek to impose successor liability upon ACS. Instead, McLaughlin alleges ACS is liable for damages from tortious interference.

 A third party can perform an otherwise legal act that, under certain circumstances, constitutes tortious interference with contractual rights. *See, e.g., Armendariz,* 553 S.W.2d at 403 (contract between bar owner and third party giving third party exclusive right to furnish bar's vending machines tortiously interfered with contract between previous bar owner and plaintiff giving plaintiff same exclusive right). Even if ACS's acquisition of First Texas' assets was, in itself, a legal act, it may still constitute an intentional act of interference that imposes tort liability for damages. Thus, article 5.10B's provisions regarding successor liability do not control our analysis.

### B. The P & C Agreement: Intentional Act of Interference

 In this case, the P & C Agreement itself contemplated an abrogation of McLaughlin's and Lazovich's Purchase Op-

tion. The P & C Agreement effectively severed the McLaughlin Agreement's assets from its liabilities. The P & C Agreement provided for this severance and placed on First Texas the duty to use all efforts to terminate the agreement. By separating McLaughlin's and Lazovich's rights from the asset, ACS placed McLaughlin and Lazovich in a position from which they could no longer exercise their purchase option, because First Texas no longer had the asset.

Information in the auditor's report from Peat Marwick put ACS on notice as to McLaughlin's and Lazovich's rights. In addition, the P & C Agreement itself provided that First Texas would use its best efforts to cause the McLaughlin Agreement to be terminated without any future obligation or liabilities. Thus, ACS acted with notice that the rights existed and with knowledge of their effect on the value of the asset it was acquiring.

The execution of the P & C Agreement effectively ended any opportunity for McLaughlin and Lazovich to receive compensation from First Texas for the asset's loss. At the time the P & C Agreement was executed, First Texas was insolvent. Further, evidence was introduced at trial that Deason knew of First Texas's financial difficulties. First Texas's insolvency made the breach of the McLaughlin Agreement virtually inevitable. We conclude ACS and First Texas clearly entered into an agreement that contemplated the abrogation of the rights held by McLaughlin and Lazovich.

### C. Kosberg's Intentional Acts

 Moreover, we find the evidence sufficient to show that Kosberg intentionally interfered with McLaughlin's and Lazovich's contract rights. Although Kosberg testified that he did not believe the P & C Agreement interfered with the rights conferred by the McLaughlin Agreement, the terms of the P & C Agreement itself, together with Kosberg's knowledge of the financial status of First Texas, could convince a jury that he knew of the effect the P & C Agreement would have on McLaughlin and Lazovich. In addition, he arranged for the transfer of the

assets to ACS. Although Kosberg testified that he did not intend to interfere with any rights, the jury could resolve the conflicts in evidence against him. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986); *Granite Constr. Co. v. Mendoza*, 816 S.W.2d 756, 763 (Tex.App.—Dallas 1991, writ denied).

The evidence was factually and legally sufficient to establish that appellants intentionally interfered with McLaughlin's and Lazovich's rights. We overrule ACS's third, fourth, fifth, and sixth points of error. We overrule Kosberg's second, fifth, and ninth points of error. We overrule Kosberg's third point of error to the extent it adopts ACS' third, fourth, and fifth points of error.

### KOSBERG'S CLAIM OF IMMUNITY

In addition, Kosberg claims in his seventh point of error that he is immune from liability because he acted as an officer of the savings and loan, and he acted in the best interests of the company. An individual who acts in good faith on behalf of a company, whether as a director or a shareholder, is shielded from liability for tortious interference with a contract unless the action furthered the individual's personal interests and was so contrary to the corporations's best interests that his actions could only be motivated by personal interest. *See Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex.1995). The burden is on the plaintiff to establish that the agent's actions were not taken in good faith. *Id.*

In this case, Kosberg arranged for the transfer of more than $75 million in First Texas assets (including the government services contracts that constituted the McLaughlin Agreement's assets) to ACS in return for shares of common and preferred stock in ACS. Kosberg himself received an option to buy a 49.9% interest in ACS. Kenneth Biederman, who at the time of the P & C Agreement was the president of Gibraltar Savings,[10] said in his deposition that he also had been offered an interest in ACS in re-

turn for executing the P & C Agreement, but declined the offer because he perceived a conflict of interest.

The monies First Texas paid at the time of the P & C Agreement far exceeded the value received. First Texas, which was insolvent, received shares of ACS stock in return for the assets received by ACS. Kosberg referred to the stock as "promises to pay." Thus, First Texas transferred a substantial portion of its assets for a potential long-term return. While this may have been a reasonable transaction for a solvent financial institution, it could not have been in the interests of an insolvent institution such as First Texas.

Moreover, First Texas agreed to a ten-year service contract to use the data processing services it transferred to ACS. As one of the conditions of this contract, First Texas had to pay the tenth year's service fee, an amount in excess of $36 million, into an escrow fund. Again, this could have been arguably reasonable for a healthy financial institution, but not for an institution that had suffered $463 million in losses and was facing possible receivership.

As a result, there was sufficient evidence for a jury to conclude that the transaction furthered Kosberg's personal interests and was so contrary to the interests of First Texas that Kosberg could have been motivated only by self-interest. We conclude that the evidence did not show Kosberg was immune from suit for entering into the agreement with ACS. *See Holloway*, 898 S.W.2d at 796. Consequently, we overrule Kosberg's seventh point of error.

### PROOF OF DAMAGES

In ACS's seventh and eighth points of error and Kosberg's sixth point of error, appellants contend that the evidence was legally and factually insufficient to establish the requisite causal link between the act of interference and the damages awarded to McLaughlin and Lazovich. In ACS's ninth

10. Gibraltar Savings and First Texas merged at the time of the P & C Agreement as part of the "Southwest Plan," a plan for reorganizing a number of insolvent savings and loan institutions. Biederman characterized his duties as those of a team leader for recapitalizing First Texas Gibraltar, the product of the merger.

and tenth points of error and Kosberg's eighth point of error, appellants challenge the amount of actual damages found by the jury.

A plaintiff in an action for tortious interference with a contract must prove that he or she suffered actual damages. *Hughes v. Houston Northwest Medical Ctr., Inc.,* 680 S.W.2d 838, 842 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985). Although the evidence must show the existence of damages with reasonable certainty, the actual amount of damages need not be certain. *Id.* The basic measure of actual damages in an action for tortious interference with contract is the same as the measure of damages for breach of the contract at issue. *American Natural Petroleum Co. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex.1990); *Capital Title Co. v. Donaldson,* 739 S.W.2d 384, 391 (Tex.App.—Houston [1st Dist.] 1987, no writ). In assessing actual damages, the jury should attempt to put the plaintiff in the same economic position he would have been in had the contract not been breached. *Armendariz,* 553 S.W.2d at 406.

We have determined that the P & C Agreement itself contemplated the abrogation of McLaughlin's and Lazovich's rights by severing the McLaughlin Agreement's assets from its liabilities. We have determined that ACS entered the P & C Agreement with notice that McLaughlin's and Lazovich's rights still existed. At the time of the P & C Agreement, First Texas was insolvent, and evidence was introduced that Deason knew of these financial difficulties. First Texas's insolvency made the breach of the McLaughlin Agreement virtually inevitable.

In fact, by the time First Texas and McLaughlin negotiated the Purchase Option's termination, First Texas was under a supervisory agreement with FHLBB. The supervisory agreement required that FHLBB approve any transactions. No approval was given. First Texas was not under this supervisory agreement in July 1988, when the P & C Agreement was executed. Had ACS and First Texas refrained from entering the P & C Agreement until First

Texas terminated the Purchase Option under the McLaughlin Agreement, the McLaughlin Agreement would not have been breached. Under paragraph 5(c) of the McLaughlin Agreement, First Texas could have bought the Purchase Option early by paying McLaughlin and Lazovich $3,000,000.

We conclude the evidence was legally and factually sufficient to show that McLaughlin and Lazovich suffered damages of $3,000,000 due to appellants' interference. Accordingly, we overrule ACS's seventh, eighth, ninth, and tenth points of error and Kosberg's sixth and eighth points of error.

## EXEMPLARY DAMAGES

In its twelfth and thirteenth points of error, ACS contends the evidence is both legally and factually insufficient to support an award of exemplary damages. To support the recovery of punitive or exemplary damages for tortious interference with a contract, there must be a finding of actual malice: ill will, spite, evil motive, or purposing the injuring of another. *See Clements v. Withers,* 437 S.W.2d 818, 822 (Tex.1969); *Corporate Wings, Inc. v. King,* 767 S.W.2d 485, 487 (Tex.App.—Dallas 1989, no writ). Actual malice need not be proven by direct evidence but may be inferred from other facts proved. *Corporate Wings,* 767 S.W.2d at 487. The jury found that ACS, ACSFS, and TransFirst Corporation acted with actual malice.

The record in this case reflects that, prior to the P & C Agreement's execution, ACS, ACSFS, and TransFirst knew of the McLaughlin Agreement and the rights it conferred on McLaughlin and Lazovich. The Peat Marwick report recommended that ACS refer the issue of resolving the McLaughlin Agreement to legal counsel. ACS also knew of First Texas' financial difficulties and the possibility that First Texas would go into receivership. Rather than allow First Texas time to resolve the McLaughlin Agreement issue, ACS insisted on proceeding with the transaction on a "compressed time frame." The execution of the P & C Agreement on the "compressed time frame" imposed by Deason, the head of ACS, effectively precip-

itated First Texas's breach of the McLaughlin Agreement.

ACS's insistence on proceeding with the transaction, notwithstanding its knowledge of McLaughlin's and Lazovich's contract rights, could allow a jury to infer malice. Moreover, ACS's knowledge of First Texas's precarious financial status and the possibility of receivership, along with the lack of notice to McLaughlin and Lazovich, could lead the jury to infer that the speed of the transaction was effected with the intent to injure McLaughlin and Lazovich. We conclude that the evidence was both legally and factually sufficient to show actual malice on the part of ACS, ACSFS, and TransFirst. We overrule ACS's twelfth and thirteenth points of error.

**JURY INSTRUCTIONS**

In ACS's eleventh point of error and Kosberg's first and third points of error, appellants contend that the trial court erred in refusing to submit a requested jury charge on intent to interfere.[11] Appellants requested the following instruction:

> You are instructed that, in this context, an action is willful or intentional where the actor desires to interfere with the contract or the actor believes that his acts are substantially certain to interfere with the contract.

The court refused the requested instruction. Instead, it gave the following instruction:

> One interferes with the contract of another if (1) there was a contract subject to interference; (2) there was an act of interference that was wilful and intentional; (3) such intentional act was a proximate cause of plaintiffs' actual damages, if any.

### A. Instructions and Elements of Cause of Action

■■■■ The trial court must submit instructions and definitions to enable the jury to render a verdict. TEX.R.CIV.P. 277. The trial court has broad discretion in submitting

jury questions. *See Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 256 (Tex.1974); *Elbar, Inc. v. Claussen,* 774 S.W.2d 45, 55 (Tex.App.—Dallas 1989, writ dism'd). To determine whether a trial court has abused its discretion, this Court may not substitute its judgment for that of the trial court, but must determine only whether the trial court's action was arbitrary or unreasonable. *Barham v. Turner Constr. Co. of Tex.,* 803 S.W.2d 731, 735 (Tex.App.—Dallas 1990, writ denied). Error in a jury charge will support reversal of the judgment only if the error comprises such a denial of the rights of the complaining party as was reasonably calculated to and probably did cause the rendition of an improper judgment. TEX.R.APP.P. 81(b)(1); *Island Recreational Dev. v. Republic of Tex. Savs.,* 710 S.W.2d 551, 555 (Tex. 1986).

■■■■ The instruction submitted to the jury in the present case precisely tracks the elements of tortious interference with a contract. *See Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 926 (Tex.1993); *Juliette Fowler,* 793 S.W.2d at 664. It required that the jury first find that a contract existed. It then required that the jury find that the defendants engaged in an act of interference which was willful and intentional. Next, it required that the jury find that the intentional act was the proximate cause of the damages. Nothing in the definition of tortious interference with contract requires more. *See Reyna,* 865 S.W.2d at 926; *Juliette Fowler,* 793 S.W.2d at 664.

### B. The Instruction and *Southwestern Bell*

In support of their points of error, appellants cite a recent case from the Texas Supreme Court. *Southwestern Bell v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex. 1992). In *Southwestern Bell,* the City of Houston and John Carlo Texas, Inc. entered into a contract to widen a road. The City notified Bell, a nonparty to the contract, that

---

11. In Kosberg's first point of error, he challenges the sufficiency of question number one in the jury charge. The question read as follows: "Do you find that any of the following Defendants interfered with Plaintiff's contract?" The instruction then defined interference. Kosberg challenges the sufficiency of the question only on the interference issue. Our discussion of the sufficiency of the definition given the jury necessarily disposes of Kosberg's claim concerning the sufficiency of the question.

it intended to widen the road. A city ordinance required Bell to relocate its telephone poles and cables. *Id.* at 471. Bell told the City that it could move its facilities by a certain date. Bell did not move its facilities by that date. As a result, John Carlo Texas claimed to have been injured by the City's alleged breach of its contract and Bell's failure to move its telephone poles and cables in a timely fashion.

The jury charge asked whether the jury found by a preponderance of the evidence that Bell knowingly and intentionally failed, without justification, to timely relocate its facilities. It answered the question in the affirmative. The Supreme Court reversed, holding that the jury charge required only that the jury find Bell intentionally *failed to timely relocate its facilities.* *Id.* at 472. However, the instruction did *not* require that the jury find that the failure to relocate was intended to *interfere with the contract* between John Carlo Texas and the City. *Id.*

In *Southwestern Bell*, the Supreme Court referred to the definition of intent in the Restatement of Torts, which says the element of intent requires that "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." RE-STATEMENT (SECOND) OF TORTS § 8A (1965). However, we do not read *Southwestern Bell* so broadly as to *require* this precise language in a jury instruction. Rather, we read it as calling for a jury instruction which requires more than a mere volitional act on the part of the alleged tortfeasor in order to show intent. The instruction must also require that the volitional act be intended to interfere with the contract. *Southwestern Bell,* 843 S.W.2d at 472.

Appellants point out in their supplemental briefs that an instruction substantially similar to the one they requested now appears as a pattern jury charge. *See* 4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 106.01 (1993). While we recognize that it may be more prudent to use this charge, the trial in this case was held in 1992, prior to both the Supreme Court's opinion in *Southwestern Bell* and the current pattern jury charge. Thus, we do not find that the cur-rent pattern jury charge guides our analysis. The question in this case is whether the instruction sufficiently instructed the jury that it had to find an intentional act of interference.

The jury charge in *Southwestern Bell* is distinguishable from the jury instruction in this case. The jury charge in *Southwestern Bell* asked only whether Bell had committed an intentional act. The jury instruction in this case, however, required that the jury first find that appellants had committed an intentional *act of interference.* This required the jury to find both that the act itself was intentional and that it was intended to interfere with the contract. We do not believe that *Southwestern Bell* requires more. To accept appellants' argument, this Court would have to ignore the phrase "of interference" contained in the court's definition of intent in its instruction.

We conclude that the trial court did not abuse its discretion in providing for the jury its own jury instruction and refusing appellants' requested jury instruction. We over-rule ACS's eleventh point of error. We overrule Kosberg's first point of error and Kosberg's third point of error to the extent it adopts ACS's eleventh point of error.

### CONSPIRACY

In Kosberg's fourth point of error, he claims the evidence was insufficient to show that he engaged in a conspiracy to interfere with McLaughlin's and Lazovich's rights. The instructions given to the jury authorized it to find the parties engaged in a conspiracy. However, the instructions did not authorize the jury to assess damages on this cause of action.

 Generally, when damages are not assessed, appellate courts will not reach sufficiency claims as to liability. *See Easley v. Castle Manor Nursing Home,* 731 S.W.2d 743, 744 (Tex.App.—Dallas 1987, no writ); *James v. Hudgins,* 876 S.W.2d 418, 423 (Tex. App.—El Paso 1994, writ denied). In this case, the trial court authorized the jury to find liability, but not to assess damages. Thus, we conclude that any error on the issue of liability is harmless. *Cf. Roberts v.*

*Burkett,* 802 S.W.2d 42, 45 (Tex.App.—Corpus Christi 1990, no writ) (error in finding appellants 20% negligent harmless when judgment gave appellants full damages, not reduced by 20%). We overrule Kosberg's fourth point of error.

## PREJUDGMENT INTEREST

In ACS's fourteenth and fifteenth points of error and Kosberg's tenth point of error, appellants challenge the trial court's award of prejudgment interest. In its judgment, the trial court assessed interest at 10% per annum, compounded daily, from July 19, 1988. In ACS's fourteenth point of error and Kosberg's tenth point, appellants contend the trial court erred in assessing prejudgment interest as of July 1988 instead of August 31, 1991, thirty days after the date the McLaughlin Agreement specified for performance. In ACS's fifteenth point of error and also in Kosberg's tenth point, appellants claim the court incorrectly awarded prejudgment interest at 10% per annum compounded daily, when the award should have been for either 6% or, in the alternative, 10% simple interest.

█ A plaintiff is not entitled to recover prejudgment interest on damages until those damages actually have been sustained. *See Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 554 (Tex.1985). In this case, McLaughlin and Lazovich sustained damages when they lost their Purchase Option. This loss occurred in July 1988, when the P & C Agreement was executed.

However, appellants argue that McLaughlin and Lazovich could not have suffered any damages until First Texas failed to perform. We disagree. We have determined that the Purchase Option was not conditioned on First Texas' obligation to repurchase. McLaughlin and Lazovich suffered damages when they lost the right to notice of a pending sale and the right to make an offer to buy back the Government Services Division. Although McLaughlin and Lazovich may have attempted to mitigate damages by negotiating with First Texas for termination of their rights, this does not affect the date on which they sustained damages.

█ In addition, appellants contend that the interest rate should have been 6%, not 10% compounded daily. Their argument is based on article 5069–1.03 of the revised civil statutes, which provides for prejudgment interest of 6% on contracts ascertaining the sum payable. TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987). However, this article applies only to cases sounding exclusively in contract. *See International Ins. Co. v. Dresser Indus., Inc.,* 841 S.W.2d 437, 447 (Tex.App.—Dallas 1992, writ denied); *Shell Pipeline Corp. v. Coastal States Trading, Inc.,* 788 S.W.2d 837, 849 (Tex.App.—Houston [1st Dist.] 1990, writ denied). The statute has no application to a case of tortious interference with a contract, which has elements of both contract and tort. *Id.*

█ Alternatively, appellants argue that the interest should have been no more than 10% simple interest. Their argument is based on article 5069–1.05, which provides that judgments in wrongful death, personal injury, and property damage cases shall be computed as simple interest. TEX.REV.CIV. STAT.ANN. art. 5069–1.05, § 6(g) (Vernon Supp.1995). This is neither a wrongful death nor a personal injury case. Moreover, it is not a property damage case. "Property damage," as used in this statute, means damage to tangible property, not economic loss or loss of economic opportunity. *Spangler v. Jones,* 861 S.W.2d 392, 398 (Tex.App.—Dallas 1993, writ denied). Accordingly, we find this statute inapplicable.

█ When no statute provides for prejudgment interest on a given cause of action, the trial court may nonetheless assess equitable prejudgment interest. *Cavnar,* 696 S.W.2d at 554. The prejudgment interest shall be at the prevailing market rate, compounded daily. *Id.* We conclude that the trial court did not err in assessing prejudgment interest at the rate of 10%, compounded daily. We overrule ACS's fourteenth and fifteenth points of error and Kosberg's tenth point of error. We affirm the trial court's judgment.

Opinion By DEVANY, Justice, dissenting.

I respectfully disagree with the majority in affirming the judgment of the trial court.

Thomas McLaughlin and John Lazovich, appellees, entered into a contract in 1986 with First Texas Savings Association which contained various provisions, among which was an option by McLaughlin and Lazovich to purchase forty-nine percent of the AMS Division of First Texas Savings Association by August 1, 1991. If the option was exercised by McLaughlin and Lazovich, then First Texas Savings Association was required to repurchase the option at a price based upon a formula which was a percentage of the gross revenues of the AMS Division's government services for the fourth and fifth years of the option period, which were 1990 and 1991, or three million dollars, whichever was less. Therefore, if the defined gross revenues for 1990 and 1991 declined sufficiently, the option price would be less than three million dollars and could be nothing. There were other provisions such as permitting First Texas to withdraw from the defined services if it so chose.

On May 12, 1989, the Federal Savings and Loan Insurance Corporation (FSLIC) lawfully repudiated the contract pursuant to the authority contained in 12 U.S.C. § 1821(e)(1)(1990), whereby a receiver of a savings and loan association may repudiate any contract of a financially failed institution if the contract requires a performance which is burdensome. Therefore, the McLaughlin–Lazovich contract became void before the option provisions matured. Whatever control existed over the contract by the parties thereto no longer existed effective May 12, 1989.

It is important to note that before the repudiation of the contract by FSLIC, First Texas Savings Association incurred huge losses which led to its financial failure. McLaughlin and Lazovich approached First Texas Savings Association on August 5, 1988, and requested that First Texas Savings Association consider moving up the options whereby McLaughlin and Lazovich would exercise their rights early in acquiring the AMS interest, which would lead to the repurchase by First Texas Savings Association. Since the fourth and fifth base years, 1990 and 1991, had not been reached, McLaughlin and Lazovich had to negotiate a new repurchase price by First Texas Savings Association. These negotiations resulted in an agreement that First Texas Savings Association would purchase McLaughlin's and Lazovich's option for one million dollars.

Before this transaction could be completed, First Texas Savings Association was placed in receivership and, subsequently, the McLaughlin–Lazovich contract was repudiated by FSLIC.

On February 12, 1990, McLaughlin and Lazovich, plaintiffs, filed suit against appellants. McLaughlin and Lazovich claimed in their petition that Affiliated Computer Systems Financial Services, Inc. (ACS), Trans-First Corporation, Darwin Deason, and J. Livingston Kosberg committed fraudulent acts which make them liable for McLaughlin's and Lazovich's loss of benefits that may have manifested in 1991. The plaintiffs claim in that petition that the defendants breached a confidential and fiduciary relationship with the plaintiffs which was the proximate cause of the damages to plaintiffs. Said plaintiffs claimed that the defendants were unjustly enriched. In addition, plaintiffs claimed fraud, conspiracy, and breach of contract, together with attorneys' fees. Subsequently, plaintiffs added tortious interference with their contract to their petition, which became the main thrust of this lawsuit.

The trial court in its charge informed the jury that one interferes with the contract of another if (1) there was a contract subject to interference; (2) there was an act of interference that was willful and intentional; (3) such intentional act was a proximate cause of plaintiffs' actual damages, if any.

In my analysis of the facts, I have assumed arguendo that the complained-of acts that occurred in 1988, wherein First Texas Savings Association sold assets to another entity, may have eventually interfered with First Texas Savings Association's ability to meet the terms of the option that would arise in 1991 under normal conditions. However, the facts of the case show that conditions were not normal. The savings and loan industry was in serious trouble nationwide. In particular, and more relevant to this case, First Texas Savings Association was suffering huge losses every year and was, therefore,

subject to strict federal regulation. The facts show that when McLaughlin and Lazovich realized that their option might be worth nothing by August 1, 1991, they made an offer to induce First Texas Savings Association to exercise its option before the base years of 1990 and 1991, which were the crucial years of government service orders that could produce the benefits to McLaughlin and Lazovich, in order to trigger a buy-back requirement early. McLaughlin's first offer was rejected, but negotiations continued and finally First Texas Savings Association agreed to pay McLaughlin and Lazovich one million dollars. It is essential that we must recall that this resolution of the contract was *after* the occurrence of the alleged tortious acts of the appellants that were complained of in the lawsuit.

First Texas Savings Association did not refuse to negotiate, nor did anyone interfere with those negotiations. The contract was consummated by McLaughlin and Lazovich to their satisfaction and possibly resulted in a greater benefit than they would have enjoyed had the parties waited for the base years of 1990 and 1991. Shortly after the parties reached this agreed conclusion of the contract, a subsequent event occurred which was unfortunate for McLaughlin and Lazovich. The FSLIC lawfully canceled the McLaughlin/Lazovich contract obligation in its entirety.

The evidence clearly reveals that First Texas Savings Association was induced to exercise an early option and *did* in fact proceed to attempt to honor its contract. I believe that the facts belie plaintiffs' contentions that First Texas Savings Association violated its promise by reason of tortious interference.

On another aspect of the case, the majority opinion opines that the contract became unenforceable, but concludes that "unenforceability of a contract, without more, is not a defense to an action for tortious interference." For this proposition, the majority cites *Juliette Fowler Homes v. Welch Associates*, 793 S.W.2d 660 (Tex.1990), as authority. However, a careful reading of that case and a case cited by *Juliette* leads this writer to conclude that the majority misreads *Juliette*.

*Juliette* cites *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex.1969). *Clements* teaches us that oral promises that are not enforceable because of the statute of frauds are still promises and that the public is better served by the performance of all promises made for lawful purposes. *Clements* says that the fact that the oral promise may not be enforceable "does not give third parties the right to interfere with the performance of oral contracts." *Clements*, 437 S.W.2d at 821. Hence, *Clements* tells us that third parties may not interfere with a promise even though a court of law will not enforce the promise because of form. That is far different from the situation we have in this case. The underlying obligation of the McLaughlin/Lazovich contract was nullified by the United States of America. There is no obligation, regardless of form, because FSLIC will not allow any payment under the contract.

The majority further misreads *Juliette* because, contrary to what the majority tells us about *Juliette*, that case *holds* that "[u]nder the facts of this case, we hold that the unenforceability of the noncompetition clause *is* a defense to Welch's tortious interference claim against Fowler." *Juliette*, 793 S.W.2d at 664 (emphasis added).

Therefore, the basis for the majority result is not supported by the law it relies upon. Furthermore, the act of interference with a contract must result in an actual *interference*. In this case, the alleged tortious act was not the proximate cause of the plaintiffs' damages. As a matter of fact, McLaughlin and Lazovich continued to deal with First Texas Savings Association after the alleged act of interference and they successfully concluded the contract early as they requested, which would have concluded the matter but for the lawful repudiation by FSLIC which made the contract *totally* unenforceable—not simply because it was not in writing as in the cases cited by the majority.

Because I find no legally sufficient evidence to support the judgment, I would re-

verse the judgment and render judgment for appellants.